177 So.2d 412 (1965)
Irene ROBERTSON, Widow of Gloss DANKS
v.
Dr. Fred W. MAHER, Sara Mayo Hospital, Michigan Mutual Liability Company, and Aetna Casualty & Surety Company.
No. 1896.
Court of Appeal of Louisiana, Fourth Circuit.
July 15, 1965.
Dissenting Opinion July 29, 1965.
*415 John P. Dowling, Calvin H. McBride and James D. McGovern, Jr., New Orleans, for plaintiff-appellee.
Lemle & Kelleher, Carl J. Schumacher, Jr., and David L. Campbell, New Orleans, for defendants Sara Mayo Hospital and Aetna Casualty & Surety Company, appellants.
Before SAMUEL, CHASEZ, and HALL, JJ.
SAMUEL, Judge.
This is a suit for damages sustained by the plaintiff when a laparotomy square was left in her body during surgery. Named defendants are plaintiff's doctor, the hospital in which the operation was performed, and their respective insurers, Michigan Mutual Liability Company and Aetna Casualty & Surety Company. During the course of a trial to a jury plaintiff settled her claim against the doctor and his insurer. In accordance with the terms of that settlement, plaintiff moved for, and was granted, a dismissal of her suit as to those defendants, reserving to her the right to proceed against the remaining two defendants. The latter, the hospital and its insurer, then filed an exception of nonjoinder of indispensable parties plaintiff. The exception was overruled, the trial proceeded against the two exceptors-defendants, and at its conclusion the jury returned a verdict in the amount of $45,000 in favor of plaintiff and against the hospital and its insurer. Judgment was entered in accordance with the verdict and the hospital and its insurer have appealed therefrom.
Plaintiff employed the doctor to remove an abdominal cyst. The surgery was performed at the defendant hospital on September 24, 1962. Following the operation, when plaintiff continued to have difficulty and her condition did not improve, she consulted other physicians who discovered a foreign substance in the abdominal cavity. On April 20, 1963 the defendant doctor performed a second operation during which he removed a laparotomy square from under plaintiff's abdominal wall.
The petition pleads the doctrine of res ipsa loquitur and alternatively alleges joint and concurrent negligence on the part of the doctor, the hospital and the latter's employees, negligence on the part of the employees allegedly being due to rendering an incorrect count of laparotomy squares. In its answer the hospital has alleged facts sufficient to support an application of the doctrine of charitable immunity as to that defendant. However, no proof was offered to support those allegations and the hospital has not urged the doctrine either in the trial court or in this court. Nor are we presented with any issue concerning the sufficiency or insufficiency of the amount awarded.
In this court appellants contend: (1) the record contains no evidence of an incorrect count; (2) liability on the part of the hospital, and consequently its insurer, attaches only for administrative acts, and not for medical acts, of hospital employees, and the laparotomy count is a medical act; (3) for the purposes of plaintiff's initial abdominal operation, the employees of the hospital became the borrowed servants of the defendant doctor and therefore the hospital and its insurer are not responsible for any negligence by such employees during the surgery; (4) the exception of nonjoinder of indispensable parties plaintiff should have been maintained and the suit dismissed; (5) plaintiff's settlement agreement with the doctor's insurer changed the position *416 of the doctor from joint tort-feasor to coadventurer and therefore is contrary to public policy; and (6) alternatively, if it be determined that there is liability on the part of appellants, they are entitled to a credit for the amount received by the plaintiff under the settlement agreement between herself and the doctor's insurer.
Testimony relative to laparotomy squares and the counting thereof was given by the defendant doctor, the chief of surgery at the defendant hospital and two employees of the hospital (the circulating nurse and the scrub nurse). That testimony reveals: Laparotomy squares, commonly referred to as "lap squares", are 12 inch by 12 inch pieces of gauze made of radiopaque material with strings attached. The hospital purchases lap squares from a surgical supply house in cartons of two dozen each. These are sterilized in the hospital and placed in units of twelve with a rubber band around each unit by the hospital linen room employees. Then the units are delivered to the operating room in sufficient numbers for use in all operations scheduled for the day. In the operating room the units are individually counted by the circulating nurse and the scrub nurse prior to the operations. The surgeon's presense is neither necessary nor important in this count. The number of squares to be used in a particular operation is recorded on a piece of paper before that operation commences. Just before the surgeon is ready to close the incision another count is made by the same nurses, either when ordered by the surgeon or, in accordance with the hospital's regular procedure, on the initiation of the nurses themselves. This count is made by the circulating nurse and the scrub nurse together, the former counting used laps which have been discarded and the latter counting the remaining unused laps. The count also includes any lap which the doctor may still have in hand. If this count falls short of the original, a search is made for the missing lap or laps until all are accounted for. The lap count is then recorded in the hospital records as "correct".
This was the procedure followed during the course of plaintiff's operation. On that occasion the lap count was recorded as correct. After that operation the procedure was changed. It now includes an additional count and the record reflects the actual number of squares used.
The record further reveals:
The defendant doctor was a visiting surgeon at the hospital. He was in complete charge of all of the operating room personnel during surgery. However, the counting of laps is not considered to be his responsibility, this procedure being part of the duties set for the nurses by the hospital. In the instant case the doctor did not recall the lap count in connection with plaintiff's initial operation. He did recall attempting to ascertain if anything remained in her abdomen before closure. He did this by passing his hand therein, but he failed to detect anything.
Subject to the surgeon's orders, the circulating nurse was in charge of the operating room. During plaintiff's initial surgery the person who held that position was a registered nurse referred to in all the testimony as extremely competent. The scrub nurse, also referred to as a surgical nurse or surgical technician, prepares the gowns, gloves, instruments, laps and sponges for surgery and participates in the lap count. She works in the "sterile field", which is in the area of the operating table assisting the surgeon. The scrub nurse in the instant case was neither a registered nor a practical nurse. She had worked "on and off" in hospitals and had three months specialized training at the defendant hospital. She had no recollection of what had happened during the operation in question and testified principally to the usual method of counting laps. She was described by the hospital's chief of surgery as a very good scrub nurse and completely qualified.
The regular procedure for counting lap squares in effect at the time of the operation had been established by the hospital *417 staff and the nurses were required to follow this procedure.
We do not agree with appellants' first contention, that the record contains no evidence of an incorrect count. The question of whether the unfortunate incident was caused by an incorrect count was one of fact determined by the jury adverse to appellants and there is sufficient evidence to support that finding. It is true there is no testimony directly to the effect that an incorrect count was made. But a correct lap count must be one in which all the squares used are accounted for. Here, although the count was recorded as correct, it is quite clear that a lap square was allowed to remain in plaintiff's abdominal cavity as a result of the operation (it was removed by the second operation), and there is no evidence at all that an additional square was used by the doctor after the count was taken.
With regard to appellants' second contention, we agree that, insofar as the hospital and its insurer are concerned, liability attaches only for administrative acts and not for medical acts of hospital employees. Jordan v. Touro Infirmary, La. App., 123 So. 726; Messina v. Societe Francaise de Bienfaissance, etc., infra. However, we do not agree that the lap count in the instant case was a medical act. As this court said in D'Antoni v. Sara Mayo Hospital, La.App., 144 So.2d 643, 646, in determining whether or not a particular act is of a professional nature we must look, not to the title or the character of the party performing that act, but to the act itself.
As pointed out in the concurring opinion in Messina v. Societe Francaise de Bienfaissance, etc., La.App., 170 So. 801, 806:
"If the act required to be done does not require the exercise of that special skill, or that special discretion, which has supposedly been developed by the training, and is an act which may just as well be done by an unskilled or untrained employee, or if the error or mistake results not from improper exercise of professional judgment, but merely from nonprofessional mistake, then liability should be held to result.
The distinction is well illustrated in Stanley v. Schumpert et al., 117 La. 255, 41 So. 565, 6 L.R.S.(N.S.) 306, 116 Am.St.Rep. 202, 8 Ann.Cas. 1044. There the physician in charge of the patient had ordered that the nurse `drop some solution prepared for the purpose into the plaintiff's eye with an ordinary medicine dropper.' Through carelessness, the nurse `did not administer the mild solution prescribed,' but `dropped alcohol freely into plaintiff's eye.' The court held that the hospital, in whose general employ the nurse was, was responsible. There, the mistake made by the nurse did not result from the improper exercise of professional judgment, but from a purely nonprofessional error. She put into plaintiff's eye something different from that ordered. If the physician had ordered drops of a certain kind to be put into the plaintiff's eye by the nurse and had not specified how many drops were to be applied, or how often the treatment should be afforded the plaintiff and had left these questions to the professional judgment of the nurse and the nurse had erred in applying too many drops, or in applying them too often, we think the result would have been entirely different, for there the mistake, if any, would have resulted from the exercise of improper professional judgment and there should have been no liability in the general employer."
See also Nations v. Ludington, 133 La. 657, 63 So. 257.
In our opinion the counting of laparotomy squares in the instant case was not an act requiring the exercise of a particular *418 skill or discretion acquired or developed by special training. It was an act which could have been done by an unskilled or untrained employee and it did not involve the exercise of any professional judgment. We conclude that the incorrect count was not a medical mistake; it was an administrative or nonprofessional mistake from which liability on the part of the hospital can result.
Insofar as it relates to the lap count, we cannot hold, as appellants urge in their third contention, that the employees of the hospital were the borrowed servants of the defendant doctor while the initial abdominal operation was being performed. The question of whether hospital employees in any particular instance are borrowed servants of the surgeon is a question of fact. Grant v. Touro Infirmary, La.App., 159 So.2d 574; D'Antoni v. Sara Mayo Hospital, supra. The trial judge charged the jury in detail regarding the borrowed servant rule, the jury obviously concluded that, under the facts of this case, in making the lap count the nurses were not the borrowed servants of the doctor, and there is sufficient evidence to support that finding.
The borrowed servant rule is based on the doctrine of respondeat superior and is founded primarily on the right to direct and supervise. The record in the instant case does establish that generally the hospital employees in the operating room during the surgery were under the direction and supervision of the defendant doctor. But they were not under the doctor's complete direction and supervision with regard to the taking of the lap count. Under the routine surgical procedure established by the hospital staff the nurses were required to take that count in the manner so established, including the taking of a count out of the doctor's presence prior to his entrance into the operating room, whether or not the count taken during the operation was ordered or required by the surgeon.
Appellants' fourth contention, that their exception of nonjoinder of indispensable parties plaintiff should have been maintained and the suit dismissed as to them, is not well founded. They filed the exception after the dismissal had been granted and it was overruled by the trial court.
The motion for a dismissal as to the doctor and his insurer, reserving plaintiff's rights against the hospital and its insurer, was made and granted late in the trial. It resulted from a settlement agreement between plaintiff and the doctor's insurer, Michigan Mutual. The jury was not informed of the agreement or of the fact that plaintiff was to receive a money consideration thereunder; it only knew that plaintiff's attorney made the motion to dismiss and that the suit was dismissed as to the doctor and Michigan Mutual. The agreement was discussed, and testimony taken in connection therewith, out of the presence of the jury. As we understand that testimony, under the pertinent terms of the agreement Michigan Mutual was obligated to pay plaintiff $25,000 and plaintiff, in turn was obligated to nonsuit the doctor and Michigan Mutual with prejudice, to indemnify the doctor and Michigan Mutual against any recovery from them by Sara Mayo Hospital and/or Aetna Casualty (the other defendants), and to give to the doctor and Michigan Mutual one-half of any judgment obtained by her against Sara Mayo Hospital and/or Aetna Casualty up to $50,000.
In support of their argument that the exception should have been maintained, appellants cite Code of Civil Procedure Articles 697 and 698, which read as follows:
"An incorporeal right to which a person has been subrogated, either conventionally or by effect of law, shall be enforced judicially by:
(1) The subrogor and the subrogee, when the subrogation is partial; or
(2) The subrogee, when the entire right is subrogated." LSA-C.C.P. Art. 697
*419 "An incorporeal right which has been assigned, whether unconditionally or conditionally for purposes of collection or security, shall be enforced judicially by:
(1) The assignor and the assignee, when the assignment is partial; or
(2) The assignee, when the entire right is assigned." LSA-C.C.P. Art. 698.
Assuming arguendo that there was a subrogation or assignment under the agreement and that Code of Civil Procedure Articles 697 and 698 are applicable in the instant case, it is clear that such subrogation or assignment would only be partial and that, as a result of the partial subrogation or assignment, the doctor and his insurer would only be necessary, and not indispensable, parties. Code of Civil Procedure Article 697, Comment (c) and Article 698, Comment (d) specifically so state.
Moreover, we are satisfied on other grounds that the doctor and his insurer were not indispensable parties plaintiff. They had no action against the appellants as a result of the agreement entered into between plaintiff and the insurer of the defendant doctor. As we understand the agreement, it neither assigns nor subrogates any part of plaintiff's cause of action; rather it purports to obligate plaintiff to give to the doctor and his insurer one-half of any judgment she may recover against appellants. The exception of nonjoinder of parties plaintiff was properly overruled.
Appellants are not entitled to the relief sought in connection with their fifth contention, that plaintiff's settlement agreement with Michigan Mutual is contrary to public policy. They argue that the agreement is void because it involves the assignment of a claim for personal injuries. Even if the agreement did contain such an assignment, it is doubtful that we could hold it contrary to public policy. See City of Shreveport v. Southwestern Gas & Electric Co., 140 La. 1078, 74 So. 559. However, we need not further consider the argument because as previously stated, the agreement neither assigns nor subrogates any part of plaintiff's cause of action.
We have given consideration to the possibility that the jury may have been misled by the dismissal of the doctor and his insurer because the jury did not know of the settlement agreement. But this is not of crucial importance in view of the fact that the situation would have been the same if plaintiff initially had filed her suit against only the hospital and its insurer, without naming either the doctor or his insurer as defendants, a procedure she could have followed had she chosen to do so.
The agreement was entered into, and the suit as against the doctor and his insurer was dismissed, after almost all of the evidence, particularly the testimony of thirteen of the fifteen witnesses who testified on the merits (including the testimony of plaintiff's own medical experts and that of the defendant doctor and the operating room nurses), was already in the record. No testimony or evidence of any kind was offered by the doctor, or by any witnesses on his behalf, after the dismissal; the only two persons who testified after that time were witnesses for the appellants. There is nothing in the record to indicate that the agreement was entered into at any time other than just before the motion to dismiss was made, and this apparently is what happened. If it had been otherwise, particularly if anyone other than the appellants had offered evidence after the dismissal, we may have reached a different conclusion.
We are concerned with, and certainly do not approve of, that part of the compromise settlement calling for payment by the plaintiff to the doctor and his insurer of a part of the judgment she may recover against the other two defendants. However, as that provision concerns itself *420 only with the plaintiff, the doctor and Michigan Mutual, and not at all with the hospital or its insurer, the question of its validity is not before us in the instant case. It does not appear that the hospital and its insurer were prejudiced or affected by the provision in any way.
Appellants' final contention, made in the alternative, is that they are entitled to a credit for the $25,000 which plaintiff was paid, or is to be paid, by Michigan Mutual under the terms of the settlement agreement. They rely on Civil Code Articles 2103, as amended in 1960, and 2203, which read as follows:
"When two or more debtors are liable in solido, whether the obligation arises from a contract, a quasi contract, an offense, or a quasi offense, it should be divided between them. As between the solidary debtors, each is liable only for his virile portion of the obligation.
A defendant who is sued on an obligation which, if it exists, is solidary may seek to enforce contribution, if he is cast, against his solidary co-debtor by making him a third party defendant in the suit, as provided in Article 1111 through 1116 of the Code of Civil Procedure, whether or not the third party defendant was sued by the plaintiff initially, and whether the defendant seeking to enforce contribution if he is cast admits or denies liability on the obligation sued on by the plaintiff." LSA-C.C. Art. 2103.
"The remission or conventional discharge in favor of one of the codebtors in solido, discharges all the others, unless the creditor has expressly reserved his right against the latter.
In the latter case, he can not claim the debt without making a deduction of the part of him to whom he has made the remission." LSA-C.C. Art. 2203.
Under our jurisprudence joint tort-feasors are liable in solido and the above quoted Article 2203 is applicable to them as well as to conventional debtors. Reiley v. Atlas Construction Company, La. App., 146 So.2d 211; Long v. Globe Indemnity Co., La.App., 144 So.2d 275; Evans v. Walker, La.App., 111 So.2d 885. Payments made on behalf of one joint tort-feasor have been allowed as a credit to reduce the net recovery from another joint tort-feasor. Landry v. New Orleans Public Service, infra; Peats v. Martin, 133 So.2d 920. And although the opposite view is not without merit and has some support (Cudd v. Great American Insurance Company, D.C., 202 F.Supp. 237), a credit cannot be allowed against such recovery unless the payment or payments have been made on behalf of another party who is also liable as a joint tort-feasor. Guarisco v. Pennsylvania Casualty Co., 209 La. 435, 24 So.2d 678; Aetna Life Ins. Co. v. Dejean, 185 La. 1074, 171 So. 450; Landry v. New Orleans Public Service, 177 La. 105, 147 So. 698, followed on remand, La.App., 149 So. 136; Harvey v. Travelers Insurance Co., infra; Roux v. Brickett, La.App., 149 So. 2d 456.
In Landry, supra, handed down in 1933, the plaintiff's minor daughter had been injured while a guest passenger in an automobile. Her claim against the host driver was compromised in an agreement which, in several respects, is similar to the one here involved. Suit was then filed against two other parties allegedly responsible for the accident. The Supreme Court reversed a Court of Appeal judgment and remanded the case to the Court of Appeal. One of the purposes for the remand was to determine, in connection with the question of whether judgment rendered against either or both of the defendants should be credited with the sum of $2,500 paid as a result of the compromise, if the host driver was a joint tort-feasor with either or both of the defendants in suit.
*421 Thus, under Landry we are required to determine, from the record as it is now made up, whether or not the doctor in the instant case was a joint tort-feasor with the hospital.
Ordinarily, on this question the burden of proof would rest upon the hospital and its insurer for they are the parties who now make that assertion. See Harvey v. Travelers Insurance Co., infra, 922. But here the case was tried practically to its completion before the settlement agreement was entered into and before the motion to dismiss was made. Until then the burden we are discussing was upon the plaintiff and appellants had no forewarning at all that they would be forced to carry such a burden. Under these circumstances it would be manifestly unfair to hold that the burden of such proof rests upon the appellants. However, we believe it unnecessary to make any determination relative to that burden.
Plaintiff's petition pleads the doctrine of res ipsa loquitur, alternatively alleges joint and concurrent negligence on the part of the doctor and the hospital, and prays only for a judgment in solido against all of the defendants. An in solido judgment could be rendered against all defendants only if the doctor and the hospital are joint tort-feasors. We are of the opinion that plaintiff is bound by her pleadings. Wilson v. Scurlock Oil Company, La.App., 126 So.2d 429. Accordingly, insofar as the present question is concerned, we hold that the doctor and the hospital are joint tort-feasors.
Harvey v. Travelers Insurance Company, La.App., 163 So.2d 915, contains an excellent discussion of the effect of the 1960 amendment to Civil Code Article 2103 on the issues now before us. We take the privilege of quoting extensively and with approval from Harvey at pages 919, 920, 921 and 922:
"Prior to the 1960 amendment of Civil Code Article 2103, it was established that one tort-feasor who had been condemned by judgment and who paid that judgment had no right to enforce contribution from other tort-feasors against whom a judgment had not been rendered. Sincer v. Heirs of Bell, 47 La.Ann. 1548, 18 So. 755. Before the amendment of that article, contribution between joint tort-feasors could be enforced only when one tort-feasor was compelled to pay damages which had been awarded by judicial decree against both, in solido. Winford v. Bullock, 210 La. 301, 26 So.2d 822; Aetna Life Ins. Co. v. De Jean, 185 La. 1074, 171 So. 450; Quatray v. Wicker [178 La. 289, 151 So.2d 208] supra; Appalachian Corporation v. Brooklyn Cooperage Co., 151 La. 41, 91 So. 539; Sincer v. Bell, supra; May v. Cooperative Cab Co., La.App. Orl., 52 So.2d 74; Kahn v. Urania Lumber Company, La.App. 2 Cir., 103 So.2d 476; De Cuers v. Crane Co., La.App.Orl., 40 So.2d 61; Spanja v. Thibodaux Boiler Works, La.App.Orl., 37 So.2d 615; Toye Bros. Yellow Cab Co. v. V-8 Cab Co., La. App.Orl., 18 So.2d 514.
It also was settled before R.C.C. Article 2103 was amended that where the claimant in a tort action entered into a compromise settlement with one joint tort-feasor, reserving his rights against the others, the remaining tort-feasors were entitled, at most, only to a credit of the amount which the claimant had actually received from the first tort-feasor against any award made to the claimant against the others. Peats v. Martin, supra; Wilson v. Scurlock Oil Company, La.App. 2 Cir., 126 So.2d 429 (Cert. denied); Lewis v. Travelers Indemnity Company, La.App. 2 Cir., 81 So.2d 178; and Cudd v. Great American Insurance Company, D.C., 202 F.Supp. 237.
In Kahn v. Urania Lumber Company, supra, which was decided after the Third Party Practice Act (Act 433 of 1954; now LSA-C.C.P. Articles 1031-1040 and 1111-1116) was enacted and before Civil Code Article 2103 was amended in 1960, *422 the court held that the Third Party Practice Act did not change the then established jurisprudence, and that despite that act the right of contribution between joint tort-feasors existed only on behalf of the joint tort-feasor who was compelled to pay damages awarded by judicial decree against both, in solido. In that case the court said:
"* * * there is no substantive law in this State granting or conferring a right upon a joint tort-feasor to contribution from another tort-feasor as such and simply because of such relationship. The right of contribution exists as between them only when they have become solidary obligors as judgment debtors, and then where one has paid the obligation, or a portion thereof, at least, in excess of his pro rata share.' (103 So.2d 479).
There is no question but that the Legislature, in amending Civil Code Article 2103 in 1960, intended to overrule legislatively the decision in Kahn v. Urania Lumber Company, supra, and to provide a substantive right to contribution between joint tort-feasors, even though they may not have been decreed by judgment of court to be solidarily liable. See explanatory note by the Honorable Henry G. McMahon to LSA-C.C. Article 2103; Lanier v. T. L. James & Company, La. App. 1 Cir., 148 So.2d 100; Vidrine v. Simoneaux, La.App. 3 Cir., 145 So.2d 400 (Cert. denied); Martin v. Central Casualty Company, La.App. 3 Cir., 136 So.2d 286. Under this article of the Civil Code, as amended, and the Third Party Practice Act (LSA-C.C.P. Articles 1031-1040 and 1111-1116), a tort-feasor may enforce contribution against a cotort-feasor by the use of the third party demand, even though the latter was not initially sued by the plaintiff. Vidrine v. Simoneaux, supra; Breaux v. Texas and Pacific Railway Company, La.App. 1 Cir., 147 So.2d 693.
Article 2203 of the LSA-Civil Code, relating to the remission or conventional discharge of solidary obligations, provides:
"The remission or conventional discharge in favor of one of the codebtors in solido, discharges all the others, unless the creditor has expressly reserved his right against the latter.
"In the latter case, he can not claim the debt without making a deduction of the part of him to whom he has made the remission.' (Emphasis added).
The first paragraph of Article 2203 has been applied to contractual and to delictal solidary debtors alike. Guarisco v. Pennsylvania Casualty Co., 209 La. 435, 24 So. 2d 678; Reid v. Lowden [192 La. 811, 189 So. 286] supra; S. P. Weaver Lumber & Supply Co. v. Ashford, La.App. 2 Cir., 12 So.2d 834. There has been some confusion in our jurisprudence, however, as to the interpretation and application of the second paragraph of that article. With reference to conventional obligations it has been interpreted as meaning that the creditor who settles with one solidary obligor thereby reduces his claim against the others by the proportionate share of the debt owed by the released debtor. See A. Ledoux & Co. v. Rucker, 5 La.Ann. 500; Lynch v. Leathers, 17 La. Ann. 118; and Succession of Daigle, 15 La.Ann. 594. With reference to tort claims, or actions ex delicto, our courts have held, as we have already pointed out, that the claimant in a tort action who has settled with and released one joint tort-feasor is entitled to recover from another tort-feasor the full amount of the debt, subject only to a credit for the amount actually paid in settlement by the first. Cormier v. Traders & General Insurance Company, La.App. 3 Cir., 159 So.2d 746; Peats v. Martin, supra; Wilson v. Scurlock Oil Company, supra; Lewis v. Travelers Indemnity Company, supra; Cudd v. Great American Insurance Company, *423 supra. See also, Comment, `Contribution Among Joint Tort-feasors: Louisiana's Past, Present, and Future,' 37 Tulane Law Review, pages 525, 540; Comment, `Solidary Obligations,' 25 Tulane Law Review, pages 217, 234; and Comment, `Contribution Among Joint Tort-feasors,' 22 Louisiana Law Review, pages, 818, 822.
We think the purpose of the 1960 amendment to Civil Code Article 2103 was to equate solidary obligors, whether their obligation arises ex contractu or ex delicto, so that any distinction which may have existed between these two types of solidary obligations before the amendment is now abolished. See Comment, 22 Louisiana Law Review 818; and Comment, 37 Tulane Law Review 525. It seems to us that, consistent with the purpose of abolishing that distinction, the second paragraph of Civil Code Article 2203 must now be applied alike to delictal as well as to contractual solidary obligors.
Our conception of the existing jurisprudence is that a solidary debtor under a conventional obligation, who pays the entire debt to the creditor, becomes legally subrogated to the rights of the creditor against the other solidary obligors for their proportionate part of the debt. See LSA-R.C.C. Articles 2104 and 2161; and Shropshire v. His Creditors, 15 La.Ann. 705; Howe v. Frazer, 2 Rob. 424; Casualty Reciprocal Exchange v. Richey Drilling & Well Service, La.App. 3 Cir., 137 So.2d 127. If the creditor, however, settles with and releases one solidary debtor, he thereafter has no further rights or claims against that debtor to which another party can be subrogated. And, in the event the creditor by his own act deprives one solidary obligor of this right of legal subrogation against another solidary obligor, then the creditor is not entitled to recover from the first debtor the share of the debt owed by the other against whom no right of subrogation remains. A. Ledoux & Co. v. Rucker, supra; Lynch v. Leathers, supra.
The decision of our Supreme Court in A. Ledoux & Co. v. Rucker, supra, was correctly summarized, we think, in a syllabus to that case which reads as follows:
`Where several persons have signed an obligation in solido, they are, inter se, debtors each one for his share. Upon the payment of the whole debt by one of them, that one is entitled to be subrogated to the rights of the creditor against the others; and so far as the creditor has impaired this right of subrogation he is barred from recovering'. (5 La.Ann. 500, Emphasis added).

* * * * * *
Our interpretation of the law relating to conventional obligations, therefore, is that where there are only two solidary obligors, and the creditor settles with and grants a remission as to one of them, reserving his rights against the other, the creditor thereby deprives the remaining obligor of his right to a legal subrogation against the released debtor, and accordingly, the creditor thereafter can claim only one-half the debt from the debtor who has not been released.
The right to enforce contribution among joint tort-feasors is based on the same right to legal subrogation which takes place among solidary debtors under conventional obligations. Since the distinction between the two types of solidary obligations has been erased with the 1960 amendment to Article 2103 of the Civil Code, we think the rules heretofore set out relating to the right to legal subrogation in conventional debts apply also to delictal obligations.
We conclude, therefore, that where the claimant in a tort action settles with and releases one of two joint tort-feasors, reserving all of his rights against the other, the remaining tort-feasor is thereby *424 deprived of his right to enforce contribution against the one who has been released. And, since the claimant by his own act has deprived the unreleased tort-feasor of this right to enforce contribution, he can recover from the latter only one-half of the damages which he sustained.
We find considerable support for this conclusion in Note 8 to Form 791, appearing in Volume 10 of the Louisiana Code of Civil Procedure, where the authors state:
"When an obligee compromises with and releases one of two joint tort-feasors from liability, even though he reserves all rights against the other, the latter is thereby deprived of his right to enforce contribution. Accordingly, any judgment against the tort-feasor who is not released can only be for half of the damages sustained by the obligee. Art. 2203, LSA-CC; Lynch v. Leathers, 1865, 17 La.Ann. 118; and Comment, 22 La.L.Rev. 818, 823, 1962. For this reason, even if this exception would be sustained, the compromise agreement would result in reducing by half the potential judgment against the original defendants, if they can prove negligence on the part of James C. Moorhead, Jr. which contributed proximately to the plaintiff's injuries.'
We conclude that under the combined provisions of Civil Code Articles 2103 and 2203 plaintiff is entitled to a judgment against the hospital and its insurer only in the amount of $22,500. This is the amount of her total damages, $45,000, reduced by one-half thereof, the doctor's proportionate share of those damages which, except for plaintiff's act of compromise and dismissal, appellants would have had the opportunity of obtaining from the doctor and Michigan Mutual by way of contribution.
For the reasons assigned, the judgment appealed from is amended only insofar as to reduce the amount awarded from $45,000 to $22,500. As thus amended, and in all other respects, the judgment is affirmed; costs of this appeal to be paid by the plaintiff-appellee.
Amended and affirmed.
CHASEZ, Judge (dissenting).
I respectfully dissent from the conclusions of the majority of the Court in this matter.
I believe the law of Louisiana applicable to this case does not permit appellants, Sara Mayo Hospital and its insurer, Aetna Casualty & Surety Company, to be held liable for alleged negligent acts of hospital employees when such employees become the borrowed servants or special agents of the doctor. And it appears clear under the Louisiana law that during surgery the employees in the general employ of the hospital become the agents and servants of the doctor in the operating room, when such employees are under the exclusive and direct control and supervision of the doctor.
In this case the two employees of the hospital, i.e. the two nurses aiding and assisting the doctor in the performance of the operation were carefully selected by the hospital, and the evidence discloses that they were competent and able employees and that their services for operations at the Sara Mayo Hospital were extensively requested by the medical fraternity operating there.
In the majority opinion filed herein it is stated that the defendant doctor was a visiting surgeon at the hospital. It may well be that the doctor was not a member of the surgical staff of the Sara Mayo Hospital, but the record discloses that he practiced his profession as a surgeon at this hospital on numerous occasions, and the author hereof is convinced that this hospital may be considered as "home grounds" to him and that he was familiar *425 with the rules, regulations and procedures which were in vogue at the hospital (as is the case in all hospitals), and that he had full knowledge of the so-called administrative functions of employees of the hospital, including the alleged routine surgical procedure requiring nurses to take counts of laparotomy squares.
It may well be that there was a miscount of lap squares or sponges used by the doctor during this operation, but the evidence does not indicate that this miscount was due to the negligence of the two nurses supplied by the hospital; these two employees of the hospital were acting for and under the direct supervision and control of the surgeon performing the operation in a professional capacity entirely and did everthing required of them as nurses on this occasion; thus they were the agents and servants of the doctor acting in a professional capacity and cannot be considered as agents of the hospital acting in an administrative capacity. In this professional procedure when the surgeon demanded the necessary instruments, they were passed to him; when he demanded lap squares, they were given to him; when he asked for a count, it was granted him, and all of this occurred during the course of the operation, was highly professional throughout, and, under no circumstances, should the individuals involved be considered as having acted administratively for the hospital.
Certainly, the nurses cannot be charged with having left a 12" × 12" laparotomy square within the body of the patient. Neither one of them placed it there, and neither one of them could have taken it out. Under the circumstances, if either one of them were negligent in any manner, they were negligent as the servants of the doctor who had full, complete control and charge of them and not as servants of the hospital acting in an administrative capacity.
For these reasons, as heretofore stated, I dissent from the judgment of the Court.