401 So.2d 1006 (1981)
James RALEY
v.
James CARTER, et al.
No. 14118.
Court of Appeal of Louisiana, First Circuit.
May 26, 1981.
Rehearing Denied August 5, 1981.
*1007 James J. Zito, Baton Rouge, for plaintiff and appellee.
Charles W. Franklin, Franklin, Moore & Walsh, Baton Rouge, for defendants and appellants.
A. Shelby Easterly, III, Taylor, Porter, Brooks & Phillips, Baton Rouge, for defendants and appellees.
Before ELLIS, COLE and WATKINS, JJ.
ELLIS, Judge:
The issues raised by defendant-appellant James Carter as to liability, contributory negligence and quantum are adequately disposed of by the reasons for judgment assigned by the trial judge, which we attach hereto as an appendix and adopt as our own.
The final assignment of error relates to the failure of the trial judge to reduce the judgment rendered herein by 75 per cent because three of the four defendants settled with plaintiff on the morning of the trial, and were released by him.
The record shows that on the morning of the trial, the suit was dismissed, with prejudice, as to F. D. Foster, Leonard W. White and George C. Anderson, all of whom were alleged by plaintiff to have failed in various duties owed him, and consequently to have been solidarily liable with defendant James Carter for plaintiff's injuries. The suit was then tried as to Mr. Carter and his insurer, without objection from either party. No *1008 evidence was adduced by either party tending to prove or negate liability on the part of Messrs. Foster, White or Anderson.
It is settled law that, when there are four joint tortfeasors, and three of them are released by the plaintiff, plaintiff can only claim one fourth of the total award made in a suit against the remaining tortfeasor. Article 2100, Civil Code; Harvey v. Travelers Insurance Company, 163 So.2d 915 (La.App. 3rd Cir. 1964). The negligence of those parties released from the suit may remain an issue in the trial, since the remaining tortfeasor is entitled to a reduction of the award only if the parties released are proved to be joint tortfeasors. If they are found not to be liable, the remaining tortfeasor is not entitled to a reduction. Harvey v. Travelers Insurance Company, supra. Wall v. American Emp. Ins. Co., 386 So.2d 79 (La.1980).
In cases in which the point of the liability of the released parties has been raised by supplemental pleadings, or in which the pleadings have been enlarged by the receipt of evidence on the point without objection, courts have placed the burden of proving the negligence of the released tortfeasors on the remaining defendant, despite plaintiff's allegations of their negligence. See Hall v. Hartford Accident & Indemnity Co., 278 So.2d 795 (La.App. 4th Cir. 1973); Wall v. American Emp. Ins. Co., supra.
Under certain circumstances, however, the plaintiff's allegations of negligence and liability on the part of those released from the suit may become binding on plaintiff. In the case of Danks v. Maher, 177 So.2d 412 (La.App. 4th Cir. 1965), there was a settlement with one defendant, during the course of the trial, and the trial was continued as to the other two defendants. When considering the question of whether the released defendant was a joint tortfeasor, the court said:
"Ordinarily, on this question the burden of proof would rest upon the hospital and its insurer for they are the parties who now make that assertion. See Harvey v. Travelers Insurance Co., infra, 922. But here the case was tried practically to its completion before the settlement agreement was entered into and before the motion to dismiss was made. Until then the burden we are discussing was upon the plaintiff and appellants had no forewarning at all that they would be forced to carry such a burden. Under these circumstances it would be manifestly unfair to hold that the burden of such proof rests upon the appellants. However, we believe it unnecessary to make any determination relative to that burden.
"Plaintiff's petition pleads the doctrine of res ipsa loquitur, alternatively alleges joint and concurrent negligence on the part of the doctor and the hospital, and prays only for a judgment in solido against all of the defendants. And in solido judgment could be rendered against all defendants only if the doctor and the hospital are joint tort-feasors. We are of the opinion that plaintiff is bound by her pleadings. Wilson v. Scurlock Oil Company, La.App., 126 So.2d 429. Accordingly, insofar as the present question is concerned, we hold that the doctor and the hospital are joint tort-feasors."
In this case, there is no evidence in the record from which we might determine the negligence or non-negligence of the parties released. The point must necessarily be decided against the party having the burden of proof. As in the Danks case, supra, we are of the opinion that it would be inequitable to place the burden of proving the negligence of the released parties on the remaining defendant, when the settlement and release took place on the morning of the trial. At that trial, plaintiff must have been prepared to make proof of their negligence, whereas the remaining defendant was only prepared to go forward with his own case. Under the circumstances, we find plaintiff to be bound by his pleadings, and that the released defendants are joint tortfeasors.
The trial judge made a total award of $140,878.98 for plaintiff's damages, which we have found to be well within the bounds of his discretion. However, the judgment must be reduced by 75 per cent in the light of our finding above.
*1009 The judgment appealed from is therefore amended so as to reduce the amount thereof to $35,219.74, and, as amended, it is affirmed. Costs of this appeal shall be equally shared by the parties hereto. All other costs shall be borne by defendants.
AMENDED AND AFFIRMED.

APPENDIX
This case involves a suit by an employee against a supervisor of his employer, commonly referred to as an "executive officer" liability suit. The plaintiff, James C. Raley, alleges in his petition that on February 4, 1976, he was involved in an accident at the Shell Chemical Plant in Geismar in this Parish. At the time of the alleged accident, the plaintiff claims that he was employed as a millwright by Continental Fremont Company, which was under contract for the construction of a large water purification tank at the Shell Plant site. The plaintiff alleges that at the time of the accident, he was directing a crane operator in lifting and placing certain materials from the outside of, to the inside of the partially constructed tank. While performing his duties, the plaintiff claims that he was required to walk along a catwalk surrounding the tank, and that in doing so, he stepped into an open hole in the catwalk, thereby incurring injuries. In his petition, the plaintiff named the following individuals as defendants, whose negligence he claims caused the said accident which resulted in his alleged injuries and damages: James Carter, job superintendent of Continental Fremont Company; Wes White, safety officer of Shell Chemical Company; and, F. D. Foster, plant manager of Shell Chemical Company. Also named as a defendant was Nationwide Insurance Company, alleged by the plaintiff to be the liability insurer of Continental Fremont Company.
The plaintiff further alleges in his petition that as a result of the said accident, he has sustained serious injuries, including a herniated lumbar disc for which surgery was required. He claims that the said accident has caused him substantial physical and mental pain and suffering and has resulted in his being rendered permanently disabled. He also alleges that the said accident has caused him to lose wages and to incur medical expenses in the past, and that, in the future, he will lose additional wages and incur additional medical expenses.
All of the defendants answered the plaintiff's petition by denying generally that they are liable for the plaintiff's alleged injuries and damages, and alleged that the plaintiff's alleged injuries and damages were caused by his sole negligence, or alternatively, by his contributory negligence.
The plaintiff later amended his petition twice: first to increase the amounts of damages he allegedly suffered in the accident; and second, to name George C. Anderson, project manager of Shell Chemical Company, as an additional defendant to the lawsuit, alleging that Anderson was also liable, along with the other named defendants, for the alleged injuries and damages suffered by the plaintiff as a result of the alleged accident. All defendants denied the allegations of the amended petitions.
Defendant Nationwide Insurance Company, as workmen's compensation insurance carrier for Continental Fremont Company, thereafter filed a petition of intervention, seeking recovery of the workmen's compensation and medical benefits paid to the plaintiff following the alleged accident.
The case was set for trial on its merits on November 8, 1979. On the morning of the trial, the plaintiff and defendants F. D. Foster, Wes White and George C. Anderson, the three employees of Shell who were made defendant, entered into a settlement agreement. Because of said settlement, the plaintiff's suit and the intervention suit of Nationwide Insurance Company were dismissed insofar as the said three individual defendants were concerned.
Also prior to trial, all defendants entered into a stipulation concerning the intervention claim of Nationwide Insurance Company. The written stipulation provided in part that if a judgment was rendered in favor of the plaintiff and against defendants James Carter and/or Nationwide Insurance *1010 Company, then the judgment would be reduced by the amount of workmen's compensation and medical benefits previously paid to the plaintiff as set forth in the stipulation. The stipulation further provided that if a judgment was rendered in favor of the plaintiff and against any defendant, then said judgment would provide that Nationwide Insurance Company, as intervenor would be excused from all future workmen's compensation and medical expense benefits up to the amount of the judgment in the plaintiff's favor, after reduction for workmen's compensation and medical expense benefits already paid.
Testifying at the trial were the plaintiff; defendant James Carter; Sam Ashley, one of the plaintiff's co-workers; Joe W. Bennett, plaintiff's union's business representative; and Jan W. Duggar, an economist called by the defendant. Introduced into evidence at the trial were the depositions of Dr. James A. Poche, one of the physicians who treated the plaintiff; G. Randolph Rice, an economist called by the plaintiff; and Mr. Bennett, although he did, as noted above, make a limited appearance at the trial. It was stipulated at trial that no adverse presumption would be drawn from the plaintiff's failure to call Dr. Ricard Caro and Dr. Charles R. Strange, physicians who also treated the plaintiff. The parties further stipulated during the trial that the testimony of Sam Allen and John Raley, also co-workers of plaintiff, if called to testify, would be substantially the same as that of Sam Ashley as to the facts of the case, and that Gayle Raley, if called to testify, would corroborate the testimony of her husband, the plaintiff, as to complaints of the injury to his back.
Many of the facts of this case are not in dispute. On February 4, 1976, the plaintiff was employed as a millwright foreman by Continental Fremont Company which was under contract with the Shell Chemical Company to construct a large water purification tank at the Shell plant site in Geismar in this Parish. Continental Fremont's supervisor at the construction site was defendant James Carter. On the day of the accident, a four man union crew was on the job. The crew had been hired by Continental Fremont through defendant Carter and included the plaintiff and his brother, John Raley, also a millwright, and the two ironworkers, Sam Allen and Sam Ashley. These four workers had been on the job for about four weeks prior to the accident. Prior to the accident several unnamed boilermakers had also been involved in the construction of the tank.
The tank being constructed was circular in design. On the day of the accident, the twenty foot high walls of the tank were in place but the roof of the tank had not yet been constructed. All along the outside top of the tank was a catwalk or launder which was approximately two (2') feet wide with walls measuring four (4') to five (5') feet high on each side. Although after completion of the tank the launder is used as part of the tank's drainage system, during the construction of the tank, the launder was used as a catwalk or passageway by the workers. Two drainage holes, in different areas, were cut into the launder. These holes covered the entire width of the launder and measured approximately two (2') feet square. Sometime prior to the accident, the drainage holes were covered by four (4) pieces of two (2") inch by four (4") inch lumber. The pieces of lumber were laid side by side and almost completely covered the drainage holes.
On the day of the accident, the construction workers were involved in installing materials and equipment on the inside bottom of the tank. A small crane was used to transport the materials and equipment from the outside to the inside of the tank. When such work is required to be done, one of the workers gets inside the launder and positions himself in such a way so that he could see what was going on in the inside and outside of the tank. This worker would act as a "flagman", giving instructions by hand signals to the operator of the crane so that the equipment and materials could be safely set down inside the tank. The flagman could not assume a stationary position inside the launder, but rather was required to move along the inside of the launder so *1011 as to always be able to see the crane operator and the other workers inside the tank at the same time.
On February 4, 1976, the plaintiff was required to be such a flagman. He claims that while flagging the crane, he stepped on the boards which covered one of the drainage holes, whereupon the boards buckled apart causing him to fall into the drainage hole resulting in the injuries and damages complained of. Following the accident, the plaintiff received first aid on the jobsite, later consulted several doctors and ultimately had surgery to remove a herniated disc in his lower back.
The issues to be decided by the Court in this case are as follows:
1. Was the accident in question caused by the negligence of James Carter?
2. If so, did the plaintiff commit any acts of negligence which contributed to the cause of the accident?
3. If the accident was caused by the negligence of James Carter and the plaintiff was not contributorily negligent, then what amount of damages is the plaintiff entitled to recover from James Carter and its insurer, Nationwide Insurance Company?
4. Finally, if judgment is rendered against James Carter and Nationwide Insurance Company, are they entitled to a reduction of the judgment because of the settlement reached between the plaintiff and defendants F. D. Foster, Wes White and George C. Anderson?
The attorneys for both the plaintiff and the defendants submitted excellent briefs to the Court following the trial of this matter.
Was the accident in question caused by the negligence of James Carter? Canter v. Koehringh Company, 283 So.2d 716 (La.S. Ct., 1973) clearly sets forth the criteria necessary for someone to be considered an "executive officer" and the tests for finding liability on such executive officer. The guidelines set forth by Canter are as follows:
"1. The principal or employer owes a duty of care to the third person, breach of which has caused the damage for which recovery is sought.
2. This duty is delegated by the principal or employer to the defendant.
3. The defendant officer, agent or employee has breached this duty through personal fault. The breach occurs when the defendant has failed to discharge the obligation with the degree of care required by ordinary prudence under the same or similar circumstanceswhether such failure be due to malfeasance, misfeasance, or nonfeasance, including when the failure results from not acting upon actual knowledge of the risk to others as well as from a lack of ordinary care in discovering and avoiding such risk of harm which has resulted from the breach of the duty.
4. With regard to the personal fault, personal liability cannot be imposed upon the officer, agent or employee simply because of his general administrative responsibility for performance of some function of the employment. He must have a personal duty towards the injured plaintiff, breach of which specifically has caused the plaintiff's damages. If the defendant's general responsibility has been delegated with due care to some responsible subordinate or subordinates, he is not himself personally at fault and liable for the negligent performance of this responsibility unless he personally knows or personally should know of its non-performance or mal-performance and has nevertheless failed to cure the risk of harm." 283 So.2d at 721.
Accordingly, for someone to be considered an "executive officer" within the scope of the cause of action asserted herein by the plaintiff that person must have some personal contact with the responsibility towards the injured employee. The evidence introduced showed that James Carter was Continental Fremont's supervisor on the job and totally in charge of the construction of the tank. He had been employed by Continental Fremont for quite some time and *1012 had constructed and supervised construction of several similar tanks prior to the construction of the Shell tank. In his sole and uncontrolled discretion, he hired and fired the construction workers. He assigned duties to them and inspected the work being done several times a day. He was the plaintiff's immediate supervisor at the time of the accident. The Court therefore holds that James Carter was such an "executive officer" and personally owed the duty to the plaintiff and his fellow workers to look out for their safety and to avoid any unreasonable risks of harm to them.
Has James Carter breached the duties he owed to the plaintiff? Evidence introduced showed that prior to the plaintiff's fall, Sam Allen, one of the ironworkers had also fallen into the same drainage hole in the launder, although not having received serious injuries. The plaintiff also introduced evidence to show that one of the boilermakers had also previously fallen into the same drainage hole. Carter admitted that he was aware of the prior fall of Sam Allen, but denied any knowledge that one of the boilermakers had fallen into the same drainage hole. Conflicting evidence was introduced as to how long prior to the plaintiff's fall the boards had been placed over the drainage hole and who had actually set the boards in place. Carter testified that he had covered the drainage hole on the same day it was cut out of the launder. The plaintiff and his witnesses, however, testified that the boards were placed by them over the drainage hole after Sam Allen fell into the hole because Carter refused to take care of the problem.
The evidence preponderates in favor of the plaintiff and against Carter on the issue of Carter's negligence. Carter had full knowledge that at least one person had fallen into the hole prior to the plaintiff's fall. Regardless of who placed the boards over the drainage hole and when they were so placed, it is obvious that the boards insufficiently covered the drainage hole. It was Carter's duty and obligation to remedy a condition known by him to be dangerous. Yet with such knowledge, Carter failed to take the reasonable and necessary steps to remedy the situation. The evidence showed that the boards used to cover the twenty-four (24) inch hole were only about twenty-eight (28) inches long, thereby leaving only about two (2) inches of board extending out from the drainage hole. The Court is not convinced that the situation could not have been made safer by Carter prior to the accident. The boards could have been made more secure or a larger solid piece of material could have been found or purchased. The Court therefor holds that a proximate cause of the accident complained of by the plaintiff was the negligence of James Carter.
Was there any negligence on the part of the plaintiff which contributed to the cause of the accident in question? In determining whether an employee is contributorily negligent, the Court must look to the rules set forth in several cases. The Court in Billedeaux vs. Adams, 355 So.2d 1345 (La.App. 3rd Cir. 1978) concluded that:
"For an employee to be held contributorily negligent and/or to have assumed the risk of the harm which ultimately resulted in his injury, the defendant must prove, by a preponderance of the evidence, that the plaintiff voluntarily and knowingly exposed himself to the danger which resulted in his injury. That determination requires a dual finding of (1) a known and obvious danger and (2) a readily available reasonable alternative." 355 So.2d at 1348.
Likewise, in Miller v. Employers Mutual Liability Insurance Company of Wisconsin, 349 So.2d 1353 (La.App.2d Cir. 1977), a similar rule was announced:
"Emerging as criteria for determining an employee's contributory negligence are: (1) relative knowledge of the danger by the supervising employee and the injured employee; (2) relative control over the employee's situation; (3) the degree to which the employee's conduct is voluntary on his part; (4) alternatives available to the employee; (5) obviousness of the danger; and (6) relative ability to eliminate the danger." 349 So.2d at 1362.
*1013 Hence, for an employee to be contributorily negligent, the Court must therefore find that (1) the danger and risk involved were obvious to the employee, and (2) even with such knowledge, an alternative course of action was readily available to the employee. The law is clear that the burden of proving contributory negligence is on the party asserting such defense.
Several times during the trial, the plaintiff stated that he knew that Sam Allen had previously fallen into the same drainage hole. The plaintiff also indicated that one of the boilermakers, whose identity was not known, had also previously fallen into the same drainage hole. It cannot be said, therefore, that the plaintiff did not have knowledge of the dangerous condition within which he was required to work.
Were alternative courses of action available to the plaintiff which would allow him to avoid the known danger? At the trial, the plaintiff introduced evidence in an attempt to show that at the time he fell into the drainage hole as he was flagging the crane. The defendants introduced evidence in an attempt to prove that the plaintiff fell into the drainage hole after he had finished flagging the crane. Although it was not disputed that to properly and safely direct the crane operator the flagman was required to move along the inside of the launder a distance of fifteen (15) to twenty (20) feet, conflicting evidence was introduced as to whether the drainage hole in question was encompassed within that fifteen (15) to twenty (20) foot area. The plaintiff's witnesses indicated affirmatively, while the defendants' witnesses asserted otherwise. Although some of the evidence was contradictory, the Court finds that the evidence preponderates in favor of the plaintiff on the issue of whether or not the plaintiff was flagging the crane at the time he fell into the drainage hole. The Court is convinced that the plaintiff could not have flagged the crane from any position other than the position where he actually undertook such operation. The defendants have failed to prove that any other reasonable alternatives were available to the plaintiff. The Court, therefore, holds that the accident was not caused by any negligence on the part of the plaintiff.
The Court must now decide what amount of damages, if any, the plaintiff is entitled to recover from the defendants because of his alleged injuries. The plaintiff's major complaint concerning his injuries is that the fall in question herniated the left side of his lumbar disc at the L5-S1 level. A short time after the accident, Dr. James A. Poche, Jr. surgically removed the herniated disc. According to Dr. Poche, whose deposition was introduced into evidence, although such an operation does involve some risk to the health and life of the patient, the plaintiff's operation and recovery were successful and without any major complications. The plaintiff recovered well from his operation and was discharged from Dr. Poche's care in May of 1976. The plaintiff returned to work, as a teacher-coach, some six months after the accident.
According to Dr. Poche, the only medical expert whose testimony was introduced into evidence, as a result of the accident in question and surgery, the plaintiff has about a five (5%) per cent anatomical disability, and, functionally, will be restricted from lifting objects weighing more than twenty-five (25) to thirty-five (35) pounds.
Much evidence was introduced to illustrate how much lifting of objects weighing more than twenty-five (25) to thirty-five (35) pounds is required in the millwright profession. The plaintiff attempted to show that millwrights are regularly required to lift objects weighing more than thirty-five (35) pounds. The defendants attempted to show otherwise. The Court believes that although a millwright may not be required to lift objects weighing more than thirty-five (35) pounds every day, some such heavy lifting is required to be done.
It should be noted that the plaintiff is trained as a teacher-coach and prior to the accident in question had been so employed and is presently so employed. Although Dr. Poche did indicate that it would be wise for the plaintiff not to return to construction *1014 work, he did specifically testify that the plaintiff could do all of the duties required of a teacher-coach with the exception of heavy lifting. The Court believes that very little, if any, heavy lifting is required as a teacher-coach.
The plaintiff is entitled to an award of general damages from the defendants for the pain and suffering, both mental and physical and the disability he has and will incur as a result of the accident in question. Considering the excellent recovery of the plaintiff from his injuries and the fact that the plaintiff should have no problems continuing to work as a teacher-coach, the plaintiff is entitled to recover from the defendants, in solido, the sum of thirty-five thousand and no/100 ($35,000.00) dollars as general damages for his mental and physical pain and suffering and disability, both past and future.
The plaintiff's final item of damages concerns his alleged loss of wages prior to trial and his future loss of wages or earning capacity as a result of the said accident and injuries received. The plaintiff will not be able to return to work as a millwright, but has returned to work as a teacher-coach. The plaintiff alleges that he has earned and will be earning less as a teacher-coach than he would have earned as a millwright, and that he is entitled to recover from the defendants the difference in earnings between the two professions. The defendants allege that the plaintiff has earned more and will be earning more as a teacher-coach than he would have earned as a millwright and therefore has and will not loose any wages as a result of the accident.
Both parties presented the testimony of expert economists in an attempt to prove their respective allegations. The plaintiff offered the testimony of George Randolph Rice, an economics professor at Louisiana State University. Testifying at the trial for the defendant was Jan W. Duggar, also a professor of economics at Louisiana State University. The conclusions reached by these experts were quite different. Dr. Rice felt that the plaintiff's past and future lost wages totaled $283,016.00 if the plaintiff does not receive any income during the summer months he does not teach, or $180,508.00 if the plaintiff receive an average of $2,500.00 during the summer months. Dr. Duggar concluded however, that prior to trial the plaintiff had lost a total of $5,665.00 in wages and will lose no wages in the future and will not have any decrease in his earning capacity as a result of the accident in question.
It seems that both experts used similar formulas to arrive at their conclusions. Basically, both began by determining the average yearly earnings for a millwright in the year 1975 and then proceeded to calculate what amounts the plaintiff could have been able to earn as a millwright prior to trial and what amounts the plaintiff could have earned subsequent to the trial during his work-life expectancy, determined to be 23.3 years from the date of the trial.
In order to determine the amount of income the plaintiff could have earned prior to trial, the experts increased the 1975 base salary by actual wage increases given to millwrights in the plaintiff's union prior to the trial. The total possible pretrial income of a millwright was then compared to the total actual income received by the plaintiff as a teacher-coach between the date of the accident and the date of the trial.
In order to determine the extent of the income to be lost by the plaintiff in the future, the experts first determined what a millwright could have earned during the plaintiff's 23.3 year work-life expectancy by increasing the amount they had determined a millwright could be earning at the time of trial by a two (2%) per cent per year of productivity and also by six and one-half (6½) per cent per year for inflation. In other words, the plaintiff could have expected a yearly increase in income in the amount of eight and one-half (8½) per cent.
In order to determine the present value of the expected future earnings a discount rate of eight (8%) per cent must be deducted from each year's projected earnings. The discounted figure is arrived at by dividing the first year's earnings by 1.08; the second year's earnings by 1.08; the third *1015 year's earnings by 1.08; etc. through 23.3 years.
The present value of the total projected earnings of a millwright was then compared to the present value of the total projected earnings of a teacher-coach, which was calculated using the same formula as was used in determining the present value of possible future earnings of a millwright. It was determined that the earnings of a millwright and that of teacher-coach would increase each year at the same rate.
The parties do not dispute that between the date of the accident and the date of the trial the plaintiff earned a total of $44,932.00 and that at the time of trial, the plaintiff had a yearly salary of $16,215.00 as a teacher-coach. There is however, much dispute between the parties concerning what amounts the plaintiff could have earned as a millwright both prior to trial and during the plaintiff's work-life expectancy.
It is obvious that the reasons for such a difference of opinion between the experts is that they had different opinions as to the extent of earnings of a millwright on or at about the time of the accident. Dr. Rice concluded that a millwright's yearly earnings at that time was approximately $20,000.00. Although it is not totally clear, Dr. Rice seems to have arrived at this figure from two sources. First, Dr. Rice indicated that Mr. Joe Bennett, the plaintiff's union's business representative, suggested to him that in 1975, a millwright in the plaintiff's union could have earned $20,000.00. The Court feels that Mr. Bennett's statement was not corroborated with other evidence and is therefore unacceptable. Second, Dr. Rice testified that nationally in 1975, construction workers worked an average of thirty-seven (37) hours per week for fifty (50) weeks a year. By multiplying the total number of hours worked per year (1850) by the hourly salary of the plaintiff at the time of the accident ($10.555), Dr. Rice concluded that the plaintiff could have been earning more than $20,000.00 for the year of 1975. The Court cannot accept Dr. Rice's conclusions that between the date of the accident and the time of trial the plaintiff could have worked thirty-seven (37) hours a week for fifty (50) weeks per year. Dr. Rice specifically stated that said average number of yearly working hours applied to construction workers generally and not specifically to millwrights. Furthermore, the estimated number of working hours were a national average and it is obvious that Dr. Rice did not consider or attempt to consider the average yearly number of working hours for millwrights in the plaintiff's union and other unions in the general area. The Court cannot therefore accept Dr. Rice's conclusion that at or about the time of trial the plaintiff could have earned $20,000.00 per year as a millwright.
Dr. Duggar, on the other hand, determined that the average yearly salary the plaintiff earned as a millwright in the two and one-half (2½) years immediately preceding the accident was $10,766.00. The Court cannot consider this amount as the average salary of a millwright at or about the time of the accident because, from the evidence introduced, it is clear that the plaintiff had personal problems prior to the accident and was not able to work full time and could have earned more prior to the accident. Dr. Duggar also testified that, in his opinion, the average yearly salary for a millwright in the plaintiff's union at or about the date of the accident was $13,981.00. He arrived at this figure by averaging out the 1975 salaries of fifty millwrights in the plaintiff's union. From a list of union members supplied to him, he basically chose the fifth, tenth, fifteenth, etc. person on the list and computed the average salary of the fifty individuals chosen.
The Court cannot however accept Dr. Duggar's conclusion that the plaintiff could have earned $13,981.00 as a millwright at or about the time of the accident. Dr. Duggar failed to consider the earnings of millwrights in other unions in this general area. More importantly though, Dr. Duggar did not lay the proper foundation to show that his conclusion was reasonable. The Court is not convinced that merely choosing fifty individuals off of a list was the proper way *1016 to determine the average yearly salary for the entire millwright membership in the union. Dr. Duggar failed to produce enough evidence to show that the average computed by him was a true average.
Although the formula used by the experts to determine past and future lost wages is reasonable and acceptable, the ultimate conclusions reached by the experts must be disregarded because the figures they used as their starting point are unacceptable, as discussed above. The Court must therefore determine for itself, in the most equitable manner in light of all of the evidence introduced, what was the average yearly salary the plaintiff could have earned as a millwright at or about the time of trial. Since much of the evidence introduced on this particular issue was uncorroborated, the Court has determined that the parties would be best served and equity done by the Court's averaging out the conclusions of the experts as to the earnings of a millwright at or about the time of trial. It is therefore the ruling of the Court that at or about the time of the accident, the plaintiff could have been earning a yearly salary of $16,990.50 as a millwright.
In order to determine wages lost prior to trial, the Court must increase the plaintiff's said wages by eight and one-half (8½%) per cent per year. In doing so, the Court has determined, as shown on Exhibit "A" attached to this judgment, that the plaintiff could have earned $71,703.17 as a millwright between the date of the accident and the date of trial. Since the plaintiff actually earned only $44,932.00 as a teacher-coach during that period, the plaintiff is entitled to recover from the defendants, in solido, the difference thereto, being the sum of Twenty-Six Thousand Seven Hundred Seventy-One and 17/100 ($26,771.17) Dollars.
As also shown on the attached Exhibit "A", at the time of the trial, the plaintiff could have been earning a yearly salary of $21,701.78 as a millwright. By utilizing the formula adopted by the experts to determine the present value of future wages that could have been earned by the plaintiff as a millwright during his work expectancy of 23.3 years (i. e., yearly increases for productivity and inflation and discounting the total to arrive at the present value of the future wages), the Court has determined, as shown on Exhibit "B" attached to this judgment, that the present value of the possible earnings of the plaintiff as a millwright during his work-life expectancy is $492,819.58.
In determining the possible future earnings as a teacher-coach, the Court has determined that as of the time of trial, the plaintiff could be earning an additional Two Thousand and No/100 ($2,000.00) per year during the summer months when he is not employed as a teacher-coach. Just as the plaintiff's salary as a teacher-coach should increase by eight and one-half (8½) per cent per year, his earnings during the summer months should also increase by that same percentage. Therefore, considering his summer earning potential, as of the time of trial, the plaintiff could have been earning $18,215.00 as a teacher-coach. As shown on the attached Exhibit "C", the present value of the possible earnings of the plaintiff as a teacher-coach with his summer earning potential during his work-life expectancy is determined by the Court to be $413,711.77. The plaintiff is entitled to recover from the defendants, in solido, the difference between the present value of the projected future earnings of a millwright and the present value of the projected future earnings of a teacher-coach, namely the sum of Seventy-Nine Thousand One Hundred Seven and 81/100 (79,107.81) Dollars.