412 So.2d 1143 (1982)
Larry G. MOBLEY, Plaintiff-Appellee,
v.
REGO COMPANY, et al., Defendant-Appellant.
No. 14799.
Court of Appeal of Louisiana, Second Circuit.
March 2, 1982.
Rehearing Denied April 12, 1982.
Writ Denied May 28, 1982.
*1144 Shadoin & Bleich by Robert E. Shadoin and E. J. Bleich, Ruston, for plaintiff-appellee.
William J. Guste, Jr., Atty. Gen. by Archie Perry and Houston T. Penn, for defendant-appellant.
*1145 Before HALL, JASPER E. JONES and NORRIS, JJ.
En Banc. Rehearing Denied April 12, 1982.
NORRIS, Judge.
This matter is on appeal from a $1,251,635.06 personal injury judgment against the State of Louisiana through its Liquified Petroleum Gas Commission for damages sustained by plaintiff as a result of an explosion at the Laurens Glass Plant in Lincoln Parish. In order to properly address the issues presented in this appeal it is necessary that we discuss at length the facts giving rise to this litigation.
On February 26, 1977, at approximately 3:00 p. m., an employee of Laurens had driven his forklift truck to the propane/butane fueling station located at the northwest corner of the Laurens loading dock for the purpose of refueling his vehicle.
The loading dock is a twenty-one foot wide platform extending approximately two hundred forty feet along the north side of the warehouse building. It is covered by a fourteen foot high flat roof which is supported by posts. At the time of the accident located at the northwest corner of the loading dock was the "fueling station" where the plant's forklift trucks were regularly refueled with a mixture of propane and butane, a liquified petroleum gas. The fueling station consisted of a pipe which ran from the main storage tank to a pole located on the loading dock a few feet from the northwest corner. To this pipe was attached a twelve and one-half foot hose with a nozzle on the end. At that time the main storage tank was located some one hundred thirty four feet north (or slightly northwest) of the northwest corner of the loading dock. The pole in question was within twenty-five feet of the north wall of the warehouse building and even closer to the original office then situated on the northwest corner of the loading dock adjacent to the warehouse wall.[1] A restroom was located immediately east of the office area within the main part of the warehouse. Doors opened from the restroom and the east wall of the office onto the loading dock. Three gas heaters were located in the area, one on the wall in the restroom and two on the wall in the office.
The northwest corner was a well used, "congested" area with employees and truck drivers going to and from the restroom area, office area, and the fueling station.
Willie Lowery, an employee of Laurens, drove his vehicle to the northwest corner of the loading dock on the day in question to refuel. He attached the nozzle end of the hose to the fuel container on his forklift and refueled. When he finished he cut the switches and valve off but did not disconnect the nozzle end of the hose from the fuel container on his forklift. Feeling nature's call he went into the restroom to use that facility. After he finished he met plaintiff, Larry Mobley, also a Laurens employee, entering the restroom. Mobley did not in any way distract Lowery who then exited the restroom, got on his forklift and pulled away from the fueling station in an easterly direction without disconnecting the filler hose from the fuel container. As his vehicle moved to a point even with the restroom door, he heard a "pop", an explosion occurred, and he was blown from the forklift by the explosion which set him on fire. It is apparent that the liquified petroleum gas escaped from the forklift drifting into the bathroom area or the office and that the gas was ignited by one of the heaters.[2]
Simultaneously with these events, Mobley was about to exit the restroom where the heater was burning. As he opened the door, he was met by a "ball of fire" that blew him backward and engulfed him in flames. When the fire diminished sufficiently to enable Mobley to escape the restroom he ran into the packing department where other employees caught him and *1146 threw a plastic bag over him to protect his severely burned body.
As a result of this accident, Mobley was hospitalized for an extended period of time as a result of his having suffered burns over sixty percent of his body, fifty percent being of the third degree.[3]
Plaintiff then filed this suit against a number of defendants, including the state. Two defendants were dismissed when the lower court sustained motions for summary judgment. Plaintiff's claims against the remaining defendants, except the state against whom plaintiff specifically reserved all rights, were dismissed by joint stipulation and judgment in December, 1979, as being settled and compromised. After a lengthy trial, the trial court in comprehensive written reasons, rendered judgment in favor of plaintiff against the State of Louisiana, through its Liquified Petroleum Gas Commission, in the amount of $1,251,635.06 together with legal interest from date of judicial demand and all costs.[4] It is from this judgment that the state of Louisiana appeals assigning two errors for our consideration:
(1) The trial court abused its discretion in allowing plaintiff to amend and supplement his petition at the beginning of trial and in not thereafter granting a continuance to appellant; and
(2) The trial court erred in finding appellant liable for plaintiff's injury.
Additionally, appellant filed an exception of no cause and no right of action in this court urging that the original and supplemental petitions filed by plaintiff failed to state a cause of action or a right of action against the State of Louisiana or against the Liquified Petroleum Gas Commission.
In considering appellant's first assignment of error, it is necessary to detail the history of this prolonged litigation.
Plaintiff's original petition was filed December 20, 1977, against five defendants, one of which was the state of Louisiana, through the Liquified Petroleum Gas Commission. Various allegations of negligence were alleged with regard to each defendant. Subsequently, the plaintiff amended his original petition to add additional defendants, to correctly identify one defendant named in the original petition, to allege additional grounds of intentional tortious acts against one group of defendants and to increase the demand for damages. The record reveals that prior to December 4, 1979, the plaintiff filed six amended petitions. All defendants, except appellant, answered the petitions and filed third party demands against all other defendants seeking indemnification and/or contribution. Appellant answered plaintiff's petitions with general denials and pled contributory negligence on the part of the plaintiff and negligence of a coworker as a bar to plaintiff's action. Appellant filed no third party demands against any of the other named defendants although it was made a third party defendant by virtually all other defendants.
On December 4, 1979, almost two years after the filing of the original petition and after a great deal of discovery, plaintiff settled his claim with all defendants except *1147 appellant and dismissed his suit as to those other defendants expressly reserving his right to proceed solely against appellant. The court ordered judgment in accord with the settlement which contained the provision that if any one or more of the released defendants were determined to be joint tortfeasors with appellant then the amount of any judgment obtained by plaintiff against appellant would be reduced by that virile portion.[5] All claims of and against all of the other parties except the claim between plaintiff and appellant were dismissed, and on December 4, 1979, they were the only two parties remaining in the lawsuit. Appellant was not a party to this Joint Stipulation and Judgment and there appears no record of this pleading having been served on appellant.
The record reflects no further action in the suit until October 7, 1980, when plaintiff filed a motion and order to fix a trial date. The order signed October 9, 1980, fixed the trial date for January 19, 1981, and notice of fixing was ordered served on all counsel. Thereafter, appellant filed a motion and order for continuance dated December 8, 1980, alleging it did not receive a notice of trial fixing until December 5, 1980, because counsels' office had been relocated. It was alleged that the complexity of the case required time to restudy all pleadings, depositions, codes, regulations, and subpoena witnesses, and that the trial date did not allow sufficient time to accomplish this. This pleading according to the certificate of service was mailed solely to plaintiff's attorney and was signed by appellant's counsel. This latter fact certainly establishes that at this time counsel for appellant had knowledge that the litigation involved only the plaintiff and appellant. A rule directed to plaintiff to show cause why this continuance should not be granted was issued by the court returnable on December 22, 1980. The minutes reflect that this motion was argued and denied on that date. Additionally, on that date, plaintiff noticed appellant that plaintiff would take the deposition of Dr. Worthen in Monroe on January 9, 1981.
The amended and supplemental petition complained of by appellant was presented to Judge James M. Dozier, Jr. before whom the case was later tried, who signed it on January 9, 1981. The attached certificate shows that a copy of same was hand delivered by plaintiff's attorney to appellant's attorney on the same date. The amended petition was actually filed on January 12, 1981.
On January 19, 1981, the record shows that Mr. Bliech and Mr. Shadoin were present on behalf of plaintiff and Mr. Perry and Mr. Penn were present on behalf of appellant. When the court inquired of appellant if it wished to make a statement prior to beginning of trial, Mr. Perry stated he wished to bring to the court's attention that the plaintiff had filed an amended petition. He then inquired as to whether the court had "signed that petition" and if the issues in that petition were the issues of the trial. Judge Dozier examined the pleading and stated that the order allowing the amended petition had been signed. At this point, appellant objected to the amended petition on the grounds that appellant had not received the full time allowed by law to answer the petition and to prepare any changes to its defense with respect to the amended petition, specifically claiming that in the original petition plaintiff alleged that appellant was jointly and solidarily liable with "two other defendants" and "that there may be some other people liable to us which we didn't have time to bring back into the lawsuit."[6]
*1148 Plaintiff's counsel responded stating that he had handed counsel for appellant the amended petition on January 9, 1981, and verbally again informed him of the posture of the suit, further stating that "last month, at a hearing that was held here in Ruston, we stated to them at that point that our whole thrust was that the state was solely responsible."
The court allowed the amendment to stand and informed appellant that according to the pleadings, as amended, the state was not being looked upon by plaintiff as a joint tortfeasor with any other parties. At this point, appellant replied: "Okay well, then, your Honor, the state hasn't filed an answer to that, so we will offer as an answer a general denial." The court allowed appellant's verbal general denial answer to each and every allegation of the amended petition and granted the state ten days within which to file a written pleading to that effect. To that statement, counsel for appellant simply replied, "Thank you, your Honor."
A careful reading of the record shows clearly that the appellant erroneously argues that it "strongly objected" to the amendment and requested a continuance in order to answer the amended and supplemental petition and make further preparation for trial. The record is completely void of any request for a continuance by appellant.
The general rule as to allowing amendments after an answer is filed is that the trial judge has much discretion in such matters and that his ruling will not be disturbed unless there has been an abuse of the discretion vested in him.[7] See Brooks v. Fondren, 199 So.2d 588 (La.App. 3rd Cir. 1967).
A valid reason for not allowing an amendment to a pleading is prejudice to the opposing party. Former Louisiana Supreme Court Justice, now Judge of the United States Fifth Circuit Court of Appeals, Albert Tate, Jr., stated in 43 Tul.L. Rev. 211, 218 (1969):
In permitting amendment or not, the most important consideration is whether the opponent is unfairly prejudiced. The "prejudice" about which we speak is based only upon the lateness of the new allegation, not upon the opponent being placed in a less favorable position to win the suit on the merits. As summarized by Barron and Holtzoff:
"What constitutes prejudice must be determined by examination of particular cases in which amendments have been considered; but the test in general seems to be that there must be some harm which the opposing party will suffer from the amendment which he would not have suffered had the original pleading followed the form sought by the amendment. Thus there is no prejudice merely because the amended pleading makes a stronger case for the amending party and makes it less likely that the opposing party will win, nor will prejudice be found in a claim that the amended pleading will require additional preparation for *1149 trial, where the issues sought to be raised were known from the beginning by the opposing party. Prejudice may be found, however, where the amendment will cause excessive delay or where a source of evidence has become unavailable or a statute of limitations would bar a new suit if the opposing party should lose the present action."
See also Wallace v. Hanover Insurance Company of New York, 164 So.2d 111 (La. App. 1st Cir. 1964).
Applying the above reasoning to the instant case, we state that appellant had every opportunity beginning in December, 1977, to file third party demands against the other defendants who were dismissed from the suit. It chose not to do so even though these other defendants were asserting third party demands against it. At the very latest, by examination of its own pleadings appellant must have known on December 8, 1980, that it was the lone remaining defendant in the action, and still it took no steps to prepare for trial on that basis. After the continuance was denied, appellant knew it had until January 19, 1981, to do what it claimed it was pressed for time to do, i.e., restudy all pleadings, depositions, codes, regulations; reassess its position; and subpoena witnesses. On January 19, 1981, appellant claimed no surprise, requested no continuance, made no complaint of inability to subpoena witnesses and after the amended petition was allowed to stand simply asked permission to file the same basic pleading it had filed throughout the entire proceedinga general denial. This request was granted. There has been no showing by appellant of genuine surprise or prejudice. If appellant was not truly prepared to go to trial on that date, that lack of preparation in our opinion did not come about as a result of the filing of the amended petition. Therefore, we find that the trial court did not abuse its discretion in allowing the amended petition to be filed.
Appellant next asserts that the trial court erred in finding appellant liable for plaintiff's injury. We disagree.
The Louisiana Constitution of 1974, Article XII, Section 10, abolishes the concept of sovereign immunity in tort cases; thus, the state, as well as its agencies, stands in no better position in the instant action than does an individual or a private firm, association, or corporation.
La.R.S. 40:1841 et seq creates the Liquified Petroleum Gas Commission as an agency of the state of Louisiana. More specifically, La.R.S. 40:1846 provides:
The commission shall have the power to make and enforce rules and regulations governing the storage, sale and transportation of liquified petroleum gases over the highways of the state of Louisiana, the installation of tanks or systems for the use of such gases ...
Pursuant to the foregoing authority, the commission adopted certain rules and regulations including but not limited to the following:
SECTION IISTORAGE CONTAINERS
This section applied specifically to containers used in storing gas for any one or combination of the following uses: filling truck tanks, bottle filling plants, stationary internal combustion engines, industrial applications, motor fuel dispensing stations, or any station from which gas is dispensed in liquid state into another container, and to all other installations where gas is stored but not used on the premises.
* * * * * *
2.7 Location of containers
(a) Each container, according to its capacity, shall be located not less than the following distance from the nearest important building or group of buildings, or line of adjoining property which may be built upon: less than 2001 gallons, 25 feet; 2001 gallons to 30,000 gallons, 50 feet; 30,001 gallons to 70,000 gallons, 75 feet; 70,001 to 90,000, 100 feet. Each container, irrespective of capacity, shall be located not less than 25 feet from any public street, highway, or railroad.
(1) The point of liquid transfer shall be located at least 25 feet from the nearest *1150 important building, or group of buildings, or line of adjoining property which may be built upon or from any public street.
The Director of the Louisiana Liquified Petroleum Gas Commission shall, in case of hardship, have authority to approve special exceptions to the above minimum distance regulations upon the submission by the dealer of a sketch, in duplicate, showing the facts as to the location, and subject to any regulations in National Fire Protection Association Pamphlet No. 58 covering such exceptions.
In the instant case, the evidence is virtually uncontradicted that the point of liquid transfer of the liquified petroleum gas into the forklift containers was closer to the building than the minimum proscribed distance. It was within 25 feet of the office at the northwest corner of the loading dock as well as the north wall of the warehouse.
The Commissioner of the Liquified Petroleum Gas Commission, Mr. Ortego, initially took the position that the commission had no jurisdiction over the installation at Laurens. Subsequently, in his testimony he conceded that the commission by virtue of the heretofore quoted statutes and rules and regulations did in fact have jurisdiction over the fueling station installation at Laurens and that Section II specifically covered that installation. As did the trial court, we conclude that the use of liquified petroleum gas at Laurens' plant is under the jurisdiction of and subject to the rules and regulations of the commission.
Appellant additionally urges that it cannot be held negligent regarding the relocation of the Laurens' fueling station installation because no sketch was ever submitted by the dealer and no exception to the minimum distance requirement was approved by the director. This argument must be addressed in light of the factual context of what actually transpired concerning the relocation of the fueling station or liquid transfer point.[8]
The evidence presented at trial shows that prior to February 6, 1975, at the request of Laurens, Mr. Charles Fuller, the butane retail distributor who serviced Laurens and a liquified petroleum gas dealer with a Certificate I permit, contacted the Liquified Petroleum Gas Commission concerning the proposed relocation of the fueling station at Laurens. The evidence indicates that a relocation of the liquid transfer point was desired because the forklifts were having difficulty traversing the ramp at the northwest corner of the loading dock to reach the propane tank located approximately 134 feet away when refueling. Fuller admittedly knew that a relocation of the liquid transfer point to some place on the loading dock would violate minimum distance requirements and would have to be approved by the commission. He testified that he contacted the commission for the purpose of obtaining such approval.
At the direction of the director of the commission, a certified inspector for the commission was sent to Laurens to meet with Fuller and officials of Laurens to give advice concerning the relocation of the fueling station. Mr. Jack Owens, the inspector, was accompanied on this trip by Mr. Robbie McMillan.[9] While the testimony of Fuller, Owens, and McMillan varies in some respects, there is no doubt that all three considered the February 6, 1975, visit to be an official visit by an inspector of the commission for the purpose of advising Fuller and Laurens concerning the relocation of the fueling station. Fuller and McMillan testified that several locations were considered and that one location, the northeast corner of the loading dock, was specifically ruled out by Owens because it was too close to Laurens' main office building as well as being too close to a building that contained telephone circuitry. Owens was apprehensive that a spark from that circuitry might *1151 ignite the gas. At trial, Owens could not recall looking at alternate sites but admitted that he considered the northwest corner of the loading dock to be safe and communicated that advice. Fuller further testified that Owens approved the relocation to the northwest corner and the evidence shows he did so without making an inspection within the office or restroom area for possible sources of ignition. Additionally, Owens did not consider the considerable number of people coming and going at that location. Owens' only consideration in pronouncing the northwest corner of the loading dock as being a safe place for the relocation of the fueling station was that it had good cross ventilation.[10] Owens informed the commission's director through his inspector's report of his visit. His report contained the following language:
"I went with Mr. Fuller and checked and gave advice of how to install butane for forklifts."[11]
After hearing all of the evidence, the trial court concluded that Owens did in fact approve the relocation of the fueling station; our review of the record substantiates this conclusion.
Under La.R.S. 40:1845, the inspectors as well as the director are charged with the enforcement of the commission's rules and regulations. Mr. Ortego, the director of the Liquified Petroleum Gas Commission, testified that inspectors are required to communicate to him any exceptions to the minimum distance regulations.[12] Owens knew on February 6, 1975, that the purpose of his official inspection was to give advice on the relocation of the fueling station. In connection therewith, we conclude that he conducted a negligent and faulty inspection and gave faulty and incomplete advice.[13]
Knowing of the dangerous nature of liquified petroleum gas and that his purpose was to insure the safe use of the substance, and being charged with knowledge of the rules and regulations of the commission and their enforcement, Owens was under an obligation to instruct the dealer and the officials of Laurens not to move the liquid transfer point until the sketch had been submitted, reviewed and approved by the director. In short, in addition to his duty to make an adequate inspection, Owens also had a duty to see that all of the rules and regulations of the commission were complied with. This he failed to do and his negligent acts of omission as well as those of commission are imputable to the commission.
*1152 It is well settled in our jurisprudence that the degree of care owed others increases in relation to the inherent danger. McCormick v. Firestone Tire & Rubber Co., 328 So.2d 911 (La.App. 4th Cir. 1976). Likewise, those who deal in or handle dangerous substances or agencies such as explosives, electricity, gas, firearms, combustibles, and fireworks are held to an extraordinary degree of care. Blackshere v. Kemper Insurance Co., et al, 352 So.2d 275 (La.App. 2nd Cir. 1977). There is no question but that liquified petroleum gas is an inherently dangerous substance. Geismar v. General Gas Corp., 182 So.2d 769 (La.App. 1st Cir. 1966).
The Liquified Petroleum Gas Commission is the ultimate authority on liquified petroleum gas in the state of Louisiana. By virtue of Owens' actions, which created the dangerous situation, the commission certainly had at least constructive notice of the hazardous conditions which violated their rules and regulations. See Jones v. City of Baton Rouge, 388 So.2d 737, 740 (La.1980).
We therefore conclude that the negligence of the inspector of the commission in approving the relocation of the fueling station in violation of the commissions' rules and regulations was a cause in fact of plaintiff's injury. Under the circumstances of this case, the inspector's negligent conduct was a substantial factor in bringing about the accident which resulted in plaintiff's injury.
The rules and regulations of the commission are obviously promulgated as a safety measure to afford a maximum degree of protection to all of those who deal with or are exposed to liquified petroleum gas, a highly dangerous substance. In order to rationally interpret and implement the purpose behind such safety regulations, they must be construed in such a manner to extend protection against the risk of the hazard that an inattentive, negligent forklift driver, here Lowery, might pull away from the point of liquid transfer without disconnecting the filler hose. The injuries which plaintiff sustained are a natural and direct consequence of appellant's violations of its duty to make a thorough and proper inspection regarding the safety of the liquid transfer point relocation and to see that its rules and regulations were enforced. It was this type of injury which the specific regulations violated contemplated to protect against. In this case, to deny recovery to plaintiff would nullify the duty imposed by the rules and regulations, rendering their protection meaningless.
The failure of the commission through its inspector, Owens, to properly enforce its own rules and regulations created an undue risk of harm to all persons traveling through the area where the transfer point was located. The resulting harm to plaintiff was certainly not so highly extraordinary as to be unforeseeable within reason. In fact, according to the testimony of A. J. Scardino, plaintiff's expert witness, it was not a question of if such an accident would happen but when it would happen. Therefore, appellant's duty included the protection against this foreseeable consequence. Under the specific facts of this case, the inattentiveness of Lowery created a risk factor that fell within the protective scope of the specific duty violated.[14] See Dixie Drive It Yourself System v. American Beverage Co., 242 La. 471, 137 So.2d 298 (La. 1962).[15]
Law and reason support the conclusion herein that appellant should not be relieved of liability. We therefore hold that appellant's duty to properly inspect, give adequate and complete advice, and to insure that its rules and regulations are complied with includes protection against such a foreseeable consequence as occurred in the instant case. Accordingly, we affirm the trial court's finding of liability on the part of the appellant for the damages suffered by plaintiff.
*1153 Appellant finally argues that it cannot be held liable in this case even if inspector Owens was negligent because any duty breached by Owens was owed to the public generally and not to any particular member of the public. In support of this "public duty doctrine" theory appellant cites the case of Dufrene v. Guarino, 343 So.2d 1097 (La.App. 4th Cir. 1977), writ denied 343 So.2d 1069 (La.1977).
As stated recently by our Supreme Court in Stewart v. Schmieder, 386 So.2d 1351 (La.1980) at page 1357:
The "Public Duty Doctrine" has come under considerable attack in recent years. It has been called "in reality, a form of sovereign immunity." Adams v. State of Alaska, 555 P.2d 235, 241 (Alaska 1971). One court has said that it sets up just the type of "proprietary" and "governmental" distinction that was disposed of by the abolition of sovereign immunity. Coffey v. City of Milwaukee, 74 Wis.2d 526, 247 N.W.2d 132 (1976). It has also been criticized because it places the costs of inadequate performance on the shoulders of the innocent victims of official neglect, rather than spreading the costs of such neglect throughout society. 39 Albany L.Rev. 599, 601 (1975). The doctrine is also said to be predicated largely upon the erroneous assumption that, without it, a municipality would be subjected to crippling judgments because of the negligence of its employees, a fear which also hampered the abrogation of sovereign immunity. 13 Colum.J.L. and Social Problems 303 (1977). The doctrine also has the effect of removing a great deal of the incentive for public bodies to see that the functions of government are carried out responsibly and with reasonable care. The need for governmental responsibility in the modern world was a major factor in this court's action in abandoning the doctrine of sovereign immunity in Board of Commissioners of the Port of New Orleans v. Splendour Shipping & Enterprises Co., 273 So.2d 19 (La. 1973). It is noteworthy that in a number of states where the doctrine is applied it has been seriously eroded in recent years. see, e.g. Oleszczuk v. State of Arizona, 124 Ariz. 373, 604 P.2d 637 (1979); Sanchez v. Village of Liberty, 49 A.D.2d 507, 375 N.Y.S.2d 901 (1975).
This court has not before now had occasion to consider the applicability of the "public duty doctrine" in Louisiana. We have, however, in many instances, held governmental entities or public officials liable for the breach of duties which, at first blush, appear to be owed to the public rather than any individual. For example, the maintenance of highways and streets by the state and local governments is an undertaking that benefits the general public and is not carried out for any particular individual. Nevertheless, we have not hesitated to find the state or local entities liable for failure to maintain the streets and highways in a reasonably safe condition. United States Fidelity & Guaranty Co. v. State of Louisiana, Through the Dept. of Highways, 339 So.2d 780 (La.1976); Pickens v. St. Tammany Parish Police Jury, 323 So.2d 430 (La.1975); Vervik v. State of Louisiana, Dept. of Highways, 302 So.2d 895 (La. 1974). Similarly, the incarceration of criminals would appear to be a duty owed to the public in general but when the custodian's negligence in allowing an escape causes injury to an individual, the custodian may be held liable. Frank v. Pitre, 353 So.2d 1293 (La.1978). Furthermore, in Eschete v. City of New Orleans, 258 La. 134, 245 So.2d 383 (1971), we held that a city might be held liable for the wrongful performance of a duty in many respects similar to that of the issuance of building permits. In that case we held that the plaintiff's allegation that the city had authorized the creation of new subdivisions, with the knowledge that such authorization would cause flooding, thereby increasing the plaintiff's peril of flooding, stated a cause of action.
Therefore, under the jurisprudence of this state, the mere fact that a duty is of a public nature, and benefits the general public, does not require a conclusion that the city cannot be found liable for the breach of that duty.
*1154 In Stewart, supra, the Court held the city parish liable for the negligence of its building inspector and, in our opinion, effectively rejected the "public duty doctrine."
As in Stewart, supra, inspector Owens and the commission had the power and duty to inspect the premises at Laurens Glass to insure its rules and regulations were complied with and that any proposed installations were "prosecuted safely." We hold that in this case the commission was charged with the special duty to conduct a proper inspection and render proper and complete advice regarding the relocation of the liquid transfer pointa special duty in favor of an individual who could foreseeably be injured by accidents resulting from its failure to do so.
We conclude, as did the Supreme Court in Stewart, supra, that a finding of liability on the part of the Louisiana Liquified Petroleum Gas Commission is not precluded by the jurisprudence of this state under the "public duty doctrine."
The evidence adduced at trial is clear that dealer Fuller had apprehensions about the relocation of the fueling station or liquid transfer point to the northwest corner of the loading dock. This is evidenced by his offering inspector Owens alternative locations. Obviously, Laurens looked to Fuller for advice about the relocation, and he looked to the commission. However, as one who deals in liquified petroleum gas, he too, is held to that extraordinary degree of care referred to hereinabove. Additionally, Fuller is charged with knowledge of the rules and regulations of the commission even though he testified he was not in possession of a copy of same on February 6, 1975. He, likewise, had a duty to submit a sketch, in duplicate, covering the facts as to the relocation to the director of the commission because admittedly, he knew that the relocation to the northwest corner of the loading dock was an exception to the commission's rules and regulations. While he testified he relied on the approval of the location by inspector Owens, he, nevertheless, is charged with knowing what his duty was under the rules and regulations. As a permit holder he must comply with all rules and regulations among which include monthly reports to the commission regarding any new installations. This he failed to do. Had Fuller performed his duty after the negligent inspection by Owens instead of simply going forward with servicing the location, the director might well have taken a "second look" at the relocation, possibly rejected and required its removal to a safe location.
Applying the same reasoning discussed above in relation to appellant, by his failure to comply with the rules and regulations of the commission, we conclude that Fuller was concurrently negligent and that his negligence, while in no way absolving the commission, was also a cause which contributed in causing harm to the plaintiff. The negligence of Fuller was responsive to and combined with that of appellant, thereby making him a joint tortfeasor.
In Carlysle v. Aetna Insurance Company, 248 So.2d 64 (La.App. 1st Cir. 1971), an employee of a butane dealer failed to comply with a mandatory inspection required by the rules and regulations of the Louisiana Liquified Petroleum Gas Commission. In holding the dealer liable the court stated at pages 67 and 68:
We are convinced that these Rules and Regulations were adopted for the protection of customers and their premises and not merely for internal regulations within the gas business. Certainly, the language of Section 5.14(h) and (i), supra, supports this interpretation.
Furthermore, we are convinced that the mandatory inspection requirement places the ultimate responsibility on the more knowledgable gas dealer to insure that the system and premises may be used in safety, without regard to whether the occupant is the owner or lessee.
See also Knockum v. Amoco Oil Co., 402 So.2d 90 (La.App. 1st Cir. 1981).
As stated earlier, Fuller was released under the restrictive settlement contained in the Joint Stipulation and Judgment of December 4, 1979. However, under *1155 the terms of that judgment it was ordered that in the event it was ultimately determined that any one or more of the released defendants was a joint tortfeasor with the state of Louisiana, and as such solidarily liable with it to plaintiff, the amount of any judgment he might obtain against the commission should be reduced by that virile portion. The answer filed by defendant on February 23, 1981, after the trial pled the negligence of Fuller and that pleading was ordered filed by the court. Thus, under Wall v. American Employers Insurance Co., 386 So.2d 79 (La.1980), since the evidence shows Fuller to be a joint tortfeasor, any judgment against the appellant must be reduced by one-half.[16]
Appellant has not discussed in its brief or assigned as an error the trial court's award of damages in this matter. Therefore, we affirm the damage awards of the trial court:[17]

1. General damages ............. $ 500,000.00
2. Past medical expenses........ 52,746.06
3. Future medical expenses...... 9,500.00
4. Past lost earnings and
 earning capacity.............. 625,889.00
TOTAL $1,251,635.06

but reduce this award by one-half to the sum of $625,817.53 for the reasons assigned.
We overrule appellant's peremptory exception of no cause of action and no right of action.
Accordingly, the judgment of the lower court is amended to reduce the award by one-half. The award shall bear legal interest from date of judicial demand until paid and appellant is cast for all costs here in the amount of $25.00 and in the trial court, *1156 including the fees for the expert witnesses and other costs assessed by the Memorandum Opinion on Rule to Tax Costs dated October 27, 1981, in the amount of $16,100.17.
AMENDED AND AFFIRMED.
NOTES
[1] This office has been moved since the accident into the warehouse building.
[2] Dr. Houston Huckaby, plaintiff's expert, testified that in his opinion the probable source of ignition was one of the heaters located in the restroom or the office. It was his opinion that these were the only possible sources of ignition.
[3] Mobley was carried by ambulance to the emergency room at Lincoln General Hospital where emergency treatment was administered. He remained in intensive care overnight at Lincoln General and the following day was transferred to the special burn unit at Baton Rouge General Hospital where he remained approximately two weeks. During this time, his condition remained critical. After being released from the burn unit he remained in the hospital until April 25, 1977, when he returned to Lincoln Parish. As the trial judge correctly observed, the process of his recovery from that point was slow and painful. He underwent an extended period of physical therapy and was subsequently hospitalized where he underwent a number of operations designed to correct as much of the effects of the burns as possible. At the time of trial it was also anticipated that additional surgery would be necessary to obtain maximum possible corrective and reconstructive effect. Mobley suffered burns over 60 percent of his body and approximately 50 percent of these burns were of the third degree type. As a result of his injuries, he has been unable to work at any kind of gainful employment since the date of the accident. The prospect of his ever being able to engage in gainful employment is projected as unlikely.
[4] The costs were assessed, fixed and taxed by separate rule.
[5] This judgment further provided that in the event it was alternately determined that appellant was entitled to indemnification from any one or more of said released defendants then plaintiff was obliged to forthwith cancel said part(s) of such judgment against such party or parties.
[6] Under the rule of Harvey v. Travelers Insurance Co., 163 So.2d 915 (La.App. 3rd Cir. 1964), appellant did not have the right to bring any of the released defendants "back into the suit." However, if appellant proved at trial that any of the released defendants were joint tortfeasors, then the judgment against appellant would be reduced accordingly. We note that under Wall v. American Employers Insurance Co., et al, infra, plaintiff had the right to amend his petition to allege that appellant was the sole tortfeasor and that the burden of proof of any negligence on the part of the released co-defendants was on appellant in order to achieve a reduction in any judgment rendered against it. We distinguish the instant case from Danks v. Maher, 177 So.2d 412 (La.App. 4th Cir. 1965) and Raley v. Carter, 401 So.2d 1006 (La.App. 1st Cir. 1981) writ granted 412 So.2d 1045 (La.1982) where no amended petitions were filed and the settlements and releases took place late in the trial and on the morning of trial respectively. In Danks and Raley the courts held that plaintiffs were bound by their allegations of negligence with respect to the released co-defendants because of the patent unfairness of the late settlements and dismissals. The instant matter does not present a situation of like patent unfairness. The settlement and release occurred on December 4, 1979, some thirteen and one-half months prior to trial and appellant certainly had knowledge thereof sometime prior to December 8, 1980.
[7] Compare Vincent v. Ryder Enterprises, Inc., et al, 352 So.2d 1061 (La.App. 3rd Cir. 1977), wherein an amended answer was filed three days prior to trial with leave of court and opposing parties had no notice of the filing prior to trial. The court there found no abuse of discretion.
[8] It is conceded that some two years prior to the accident the point of liquid transfer was at the propane tank which was located approximately 134 feet from the building in question.
[9] At the time of the inspection made the issue of this suit, McMillan was an ammonia inspector. At the time of trial, he was an inspector for the Liquified Petroleum Gas Commission.
[10] The testimony of the plaintiff's expert witnesses was to the effect that there actually was no cross ventilation at that location because of the roof, warehouse wall, and the parked trucks.
[11] See Exhibit P-8.
[12] It is noteworthy that after the accident, when Laurens was attempting to again move the propane tank and point of liquid transfer that Mr. Fuller was instructed by the commission not to do anything until after the required sketch had been submitted, approved by the director, and he had received notice of the approval.
[13] Two eminently qualified experts, Dr. Houston Huckaby and Mr. A. J. Scardino, Jr., testified that the northwest corner was indeed a dangerous location and should not have been approved. Mr. Scardino, accepted by the court as an expert in the field of safety and human factor engineering with extensive experience in dealing with liquified petroleum gas, also testified that the fueling station was without doubt located within the prohibited distance of 25 feet and was in fact considered an "inside the building location" because it had a roof over it, a back wall, and the front side of the dock was restricted by the almost constant presence of large trucks backed up to the loading dock. Scardino stated that he "positively" "absolutely" would not have approved the northwest corner as the point of liquid transfer. He further testified that Lowery's action in failing to disengage the filler hose was a foreseeable occurrence that should have been considered at this particular northwest corner location stating that workers do not drive off with the filler hose still attached on a recurrent basis but that it does happen. He further stated that the rules and regulations of the commission are promulgated with this anticipated occurrence in mind. Additionally, Owens and Ortego testified that they were aware of the occurrence of this type of accident. Scardino further testified that the northwest corner of the loading dock at Laurens was indeed an area likely to have an accident of the nature that occurred in this case. His opinion was that it was not a question of if the accident would happen but rather one of when it would happen.
[14] Refer to footnote 13, supra.
[15] See also Malone, Ruminations on Dixie Drive It Yourself Versus American Beverage Company, 30 La.L.Rev. 363 (1970); and McDonald, Proximate Cause in Louisiana, 16 La.L. Rev. 391 (1956).
[16] We note in our review of the record that there is ample evidence to determine that Lowery's pulling away from the fueling station without disconnecting the filler hose from the forklift's fuel container was an act which was a contributing factor in the occurrence of this accident. However, because the exclusive remedy provision of the Workmen's Compensation Act as found in La.R.S. 23:1032 is applicable to the instant situation, Lowery is granted immunity from civil liability for any negligent injury of a fellow employee while engaged in the course and scope of his employment. See Fox v. Commercial Union Ins. Co., 396 So.2d 543 (La.App. 3rd Cir. 1981). Since there can be no tort liability on the part of Lowery to plaintiff, he cannot be liable for contribution as a joint tortfeasor. See Waggoner v. Kellogg-Moore Oil Co., Inc., 375 So.2d 197 (La.App. 2d Cir. 1979). It therefore follows that because Lowery cannot by law be held to be a joint tortfeasor, thus liable for contribution, the judgment here cannot be reduced by his virile contribution. It is further noted that we find Lowery's action to be entirely foreseeable and to be the very type of risk that the rules and regulations were designed to protect Mobley against.
[17] The evidence shows conclusively that plaintiff suffered burns over 55-60 percent of his body, and that one-half of these burns were of the third degree type. The trial court determined that plaintiff suffered a "great amount of pain" at the time of the injuries and in spite of sedation during the extended period of treatment and recovery to the date of trial and still faced much more pain and suffering in the future from the plastic and reconstructive surgery projected by Dr. Worthen. Plaintiff's skin will continue to be extremely sensitive to slight variations in temperature making it necessary to live in a controlled climate situation. His face is badly disfigured and he has extensive, permanent injuries to his hands, arms, neck and entire upper torso. His voice changed due to damage to his vocal cords. He can no longer sing or play the guitar. Once an avid hunter, fisherman and ball player, he is for the most part unable to normally engage in these activities. Future projected surgical procedures will not produce anything near total recovery but will provide him with some additional mobility for parts of his head, limbs and body now restricted in movement. They will only partially alleviate some of the gross facial and body disfigurements. Therefore, it is an understatement to say that plaintiff is totally and permanently disabled. He has suffered mental and emotional trauma from his injuries. His marital relationship will never be what it was prior to the accident. The trial court aptly described the extent of plaintiff's injuries when it concluded:

"In view of this comparison and in the light of the other testimony, both lay and expert, concerning his condition and the effects of the injuries upon him, it is apparent that the Larry G. Mobley shown in the photographs,... and as he is described prior to February 26, 1977, is gone, never to return again as an integral personality. Only broken fragments remain behind. No part of his physical being and abilities is unaffected by his injuries."
After reviewing the record, we are of the opinion that the trial court's findings of fact regarding the extent of plaintiff's injuries and disability are well founded as are the monetary damages awarded therefor.