527 So.2d 1004 (1988)
Earl CLEMENT III, and his parents, Mr. and Mrs. Earl Clement, Jr.
v.
Kevin ARMONIET, Dennis Armoniet, George Armoniet, Jr., and XYZ Insurance Company.
No. 87-CA-884.
Court of Appeal of Louisiana, Fifth Circuit.
May 16, 1988.
*1006 Joseph R. Ward, Jr., Ward & Clesi, New Orleans, for defendants-appellants.
Lowell Dye, Andry & Andry, New Orleans, for plaintiffs-appellees.
Before KLIEBERT, BOWES and GRISBAUM, JJ.
GRISBAUM, Judge.
This personal injury matter relates to a social host's liability for the actions of third parties. The appellant, Earl Clement III, sustained injuries while fighting at a party given by Wayne Jones, one of the named defendants, at the Jones' residence. Clement and his parents sued various parties for damages, and the case was settled before trial by a "Mary Carter Agreement" as to all defendants except Jones. The trial court presided over a four-day jury trial and rendered a verdict in favor of the plaintiff, which was basically in accord with the jury's findings. Jones appeals suspensively; Clement and his parents answer the appeal, asking for an increase in damages and further complaining that the trial court erred in its apportionment of fault. We affirm.
FACTS
Eighteen-year-old Wayne Jones lived with his parents. While Mr. and Mrs. Jones were vacationing in Texas, Wayne and his friend Mark Clement decided to throw a party at the Jones' residence. This decision was made on Saturday, August 12, 1982, the day of the party. Invitation was by word-of-mouth. Testimony of Wayne and others present at the party indicates that, at various times in the evening, anywhere from 9 to 35 people were present.
The party was "B.Y.O.B." ("Bring Your Own Booze"). Wayne contributed a fifth of Tequila and several others each brought a fifth. A mixture known as "Long Island Tea" was prepared and made available throughout the evening to all who were present. When the punch bowl was empty, everyone "passed the hat" around. Wayne contributed money at that time for the purchase of more liquor.
Wayne testified that he knew several of the people present were under the legal drinking age of 18, including his 17-year-old friend, Dennis Armoniet. Wayne had known Armoniet since the sixth grade, and he stopped by Armoniet's house in Kenner to personally invite Dennis and his brother Kevin, who was 21, to the party. Wayne testified that he did not warn anyone under the age of 18 not to drink the punch, even after some of the minors were obviously very drunk and fighting broke out. He said he himself was "pretty busted" that evening.
Although the witnesses' memories of the time each of the following events occurred is somewhat faulty, at some point in the evening the police were summoned. Wayne Jones was not even aware of the first visit until someone informed him of it later, because he was upstairs with his girlfriend when the police arrived. The police asked that the music be lowered. At that time, Earl Clement III lowered the stereo and asked everyone to quiet down. The police returned later to ask Wayne to stop riding his motorcycle up and down the street because it was disturbing the neighbors.
Sixteen-year-old Skippy Scioneaux became so intoxicated that he fell through a glass coffee table. Nineteen-year-old Greg Dunn helped him to his feet and began to brush the glass off of him. Dennis Armoniet apparently thought Greg Dunn was going to harm Skippy Scioneaux, and obscenities were exchanged. Kevin Armoniet intervened to stop the fight. Wayne Jones was upstairs when this happened; someone told him what had happened, and he came downstairs to see if everything was all right. In the meantime, Greg took Skippy out to a van to "sleep off" the effects of the alcohol. Wayne did not check on Skippy's condition after Skippy fell through the table. He testified that he stayed downstairs for about two minutes to smooth *1007 things over between Greg and Dennis. Wayne did not ask either one of them to leave the party. Then he went upstairs again because Greg and Dennis had promised him they had calmed down, and he did not think it necessary at that point to stay downstairs and supervise the conduct of the guests at the party. When asked during the trial if he felt the party was getting out of control at that point, Wayne answered, "I imagine it was, and being Skippy fell through the table."
About half an hour after Wayne went back upstairs, a second altercation between Dennis and Greg broke out in the upstairs hallway. Three of the four upstairs bedrooms were occupied at that time by Wayne and his date, Carla; Kevin and his girlfriend; and Earl Clement III and his girlfriend. Wayne came out of the bedroom he was in and stood between Greg and Dennis, trying to control Greg, who was a large individual. Dennis began banging on the door to the room Kevin was in, yelling for help from his brother Kevin, who was larger than Dennis and knew karate. Earl heard the ruckus and came out of the room where he had been napping to ask them to quiet down. When he saw Dennis attacking Greg and Wayne trying to restrain Greg, he thought they were both ganging up on Greg, who was one of his closest friends. In an effort to break the fight up, he pulled Dennis away from Greg. By that time, Kevin had appeared and saw Earl drag his brother to the side. When Earl turned around, Kevin hit him in the eye with the fiberglass cast he wore on his arm. Earl's eye was cut pretty badly and bled profusely. The boys all tumbled into Kevin's bedroom. Other people from downstairs had heard the noise and had come upstairs as well. Brian Guidry saw Earl's eye, pulled him out of Kevin's room, and brought him downstairs to attend to his eye. Earl was dizzy and worried about passing out while Brian cleaned his eye. At that point, Brian thought about bringing him to the hospital.
Then Earl and Brian heard the people upstairs run downstairs. Mark Clements had come to Wayne's aid to try to stop the fighting. Wayne saw Dennis run through the living and dining rooms and enter the kitchen. He went into the kitchen and helped Mark pull Greg off of Dennis. He saw Dennis run out of the house; by the time he ran out of the front door, he saw Earl and Brian lying on the street.
Brian Guidry testified that he saw Dennis and Kevin Armoniet walk out of the house. He told Earl, "We got to get these people out of here. This stuff is, you know, crazy." Brian and Earl went outside and approached Kevin. Both of them testified that they were not sure if Kevin intended to leave the party for good at that point, because Kevin's girlfriend was still in the house, and he was barefooted and wasn't wearing a shirt. Both Earl and Brian testified that they had no intention of fighting Kevin when they approached him. Earl testified that he was trying to ask the Armoniets to leave the party because there was too much tension in the air. Brian testified that he saw Kevin two houses away, banging on the door and saying, "Call the police, they're trying to kill me." Earl did not see Kevin knocking on doors or screaming for help. Earl explained that he approached Kevin because Kevin seemed to be more in control and Earl figured he had "a little bit more responsibility and ... knew it was time to get out of there...." He surmised that since everyone upstairs had been yelling at them to take the fight outside, Kevin might have thought Earl was looking for a fight.
Neither Earl nor Brian were carrying a weapon, and neither had the chance to speak to Kevin before he kicked them. When Earl and Brian were three to five feet away from Kevin, he gave Earl a karate kick in the face and then kicked Brian in the chest. Both Brian and Earl fell onto the street. Earl was unconscious, and Brian had the wind knocked out of him. Wayne testified that he went to get something to lay on Earl's head because Earl was bleeding. Someone carried Earl into the house. At that point, Wayne did not call the police, and he does not think anyone at the party called the police. The police arrived 15 minutes later. Earl was *1008 still unconscious when the ambulance arrived.
ISSUES
We are called upon to determine four specific questions:
(1) Whether the trial court erred in upholding the jury's findings of comparative fault;
(2) Whether the trial court erred in allowing the jury to know that Wayne Jones was arrested for criminal charges arising out of this incident, thereby basing their verdict on improper considerations;
(3) Whether the trial court erred when it reduced the jury's verdict by 50 percent, which represents the percentage of liability not attributed to Wayne Jones; and
(4) Whether the trial court erred in its award of damages.
ANALYSIS
Issue One
In addressing the initial issue of the trial court's apportionment of fault, we note that this Circuit recently in Gallagher v. Favrot, 499 So.2d 1205, 1208-09 (La.App. 5th Cir.1986), writ denied, 503 So.2d 23 (La.1987), enunciated the Louisiana Supreme Court guidelines, as stated in Watson v. State Farm Fire and Casualty Ins. Co., 469 So.2d 967, 973-74 (La.1985), stating:
We now turn to determine whether the percentage of fault allocated by the jury to the tenant-victim (75 percent) was manifestly erroneous. The Louisiana Supreme Court in Watson v. State Farm Fire and Casualty Ins. Co., 469 So.2d 967, 973-74 (La.1985) states:
We recognize that a standard for determining percentages of fault has not been provided by the Legislature, and we are therefore presented with an opportunity to offer guidelines as we apportion fault.... In so doing we have looked to the Uniform Comparative Fault Act, 2(b) and Comment (as revised in 1979), which incorporates direction for the trier of fact. Section 2(b) provides:
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
Additionally, we must be ever mindful that our standard of review regarding apportionment of fault is whether the trial court was clearly wrong; in other words, whether there was evidence before the trier of fact, which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trier of fact's determination, which finding should not be disturbed on review unless it is clearly wrong or manifestly erroneous. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring Co., 283 So.2d 716 (La.1973); Campbell v. Tidwell, supra. [407 So.2d 1359 (La.App. 3d Cir.1981)]
The record shows the jury unanimously apportioned liability as follows:

A) Kevin Armoniet 24%
 ____
B) Dennis Armoniet 10%
 ____
C) Greg Dunn 8%
 ____
D) Wayne Jones 50%
 ____
E) Earl Clement, III 8%
 ____
 TOTAL 100%

After a careful review of the record, we find it amply supports the jury's finding of fault as to each party. In order to further clarify the apportionment question, we will *1009 now analyze the jury's findings of fault regarding each defendant.
KEVIN ARMONIET
Although it is true that Kevin is older than the other defendants, it is likewise true that he broke up the first fight between Dennis Armoniet and Greg Dunn, and only came to his brother's aid in the second fight when he heard his brother pounding on the door and yelling for help. The record indicates he had fled the erupting tension in the Jones' house in an attempt to get a neighbor to call the police. Even the victim suggested that the circumstances might lead Kevin to believe Earl and Brian intended to fight him. For these reasons, the jury's assessment of 24 percent liability to Kevin Armoniet is entirely reasonable.
DENNIS ARMONIET
The record supports the fact that Dennis was the source of most of the trouble, but he was a minor at a completely unsupervised party where liquor was freely dispensed to all. The jury apparently found that "but for" the negligence of Wayne Jones in serving alcohol freely to minors and in being so absent that he did not even know the police had been to his house during the first of their three visits that evening, this tragedy might have been prevented. Accordingly, the jury's apportionment of only ten percent liability to Dennis Armoniet is, we find, not "clearly wrong" under the facts and circumstances presented.
GREG DUNN
Although he did participate in the fighting, Greg Dunn was repeatedly the target of Dennis Armoniet's taunting, obnoxious behavior. The record further shows he tried to avoid the fight until Dennis pestered him so much he lost his temper and lashed out in rage. The jury's finding that Greg was only eight percent liable cannot be said to be manifestly erroneous.
WAYNE JONES
Wayne's negligence spills over from the very "get go" until the closing curtain of this tragic evening. His serving an uncontrolled amount of liquor to minors and continuing to serve it in that manner even after one 16-year-old individual fell through a glass coffee table, almost leading to a fight between Dennis and Greg, is contrary to the reasonable standard of behavior for any normal young adult. Not only did Wayne not do much to remedy the situation, he disappeared as soon as the incident was over, staying downstairs only long enough to tell Greg and Dennis to "cool it." The key fact in upholding the jury's apportionment of fault as to Wayne is, we find, that the primary instigator of all of this trouble, Dennis Armoniet, was a minor to whom Wayne had continued to serve liquor, even after he saw that Dennis was so drunk he was getting out of hand. Moreover, Wayne did not even attempt to contact the police when the fighting became so uncontrollable that one of the participants ran screaming to a neighbor's house to get the police. Considering the entire event in toto, we cannot say the jury's apportionment of 50 percent fault is clearly erroneous.
EARL CLEMENT III
Although common sense tells us that Earl Clement III may not have acted wisely in following Kevin Armoniet outside, the facts indicate that he had no intention to fight Armoniet and acted as he did because he wanted the fighting to stop. Moreover, Kevin had already hit him once in the face, causing him to bleed profusely and to feel dizzy and faint. The jury apparently found he must have been somewhat stunned when he walked outside, for unlike Brian, who was standing right next to him, he failed to notice Kevin banging on the neighbor's door and yelling, "Get the police! They're trying to kill me!" The jury's apportionment of eight percent liability to Earl Clement, we find, is not manifestly erroneous. Accordingly, we find no error.
*1010 Issue Two
Concerning the question of Wayne Jones' arrest, we note the following colloquy:
Q How many people were there when the police came at the end of the party?
A Twenty-five or six, I think.
Q Was there any reason you would remember 25 or 26?
A I think that's how many people went to jail.
Q What did they go to jail for?
A Disturbing the peace and contributing to minors.
Q Contributing to the delinquency of minors?
A Yes, sir.
Q Did you ever get convicted of either of those charges?
A No.
La.R.S. 13:3739, entitled "Use of prior criminal conviction in civil cases," in pertinent part, states:
A person claiming damages for injury to person or property, or for wrongful death, in a civil action may introduce evidence that a party alleged to have caused the damages was convicted, either after a trial or upon a plea of guilty, but not upon a plea of nolo contendere, of a crime punishable by death or imprisonment and arising out of the factual circumstances in which the party is alleged to have caused the damages.
Our jurisprudence is replete in finding that the attempt to introduce evidence concerning a party alleged to have caused damage who was not convicted constitutes error. However, jurisprudence is also replete in stating that if the facts and circumstances so strongly support the jury's verdict that the error, per se, would not have made a difference in the outcome, the attempt to introduce the evidence does not rise to the level of a "prejudicial error" requiring reversal. From this record, we see no prejudice whatsoever.
Issue Three
We now turn to address the question of whether the trial court erred when it reduced the jury's verdict. The appellees, in their answer to this appeal, claim initially that the trial court incorrectly applied La.C.C. art. 2323 to the jury award when it reduced the jury's verdict by a total of 50 percent, the percentage of liability not attributable to Wayne Jones, when the jury found Earl Clement to be only eight percent negligent and did not assess any degree of comparative negligence against Earl's parents. La.C.C. art. 2323, entitled "Computation of damages," states:
When contributory negligence is applicable to a claim for damages, its effect shall be as follows: If a person suffers injury, death or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the claim for damages shall not thereby be defeated, but the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death or loss.
Additionally, our jurisprudence has found that a defendant may reduce his obligation to a plaintiff by showing that another tortfeasor, with whom plaintiff has settled and who is no longer a party to the action, is also responsible in some way for plaintiff's injuries. See Wall v. Amer. Employers Ins. Co., 386 So.2d 79 (La.1980) and Mobley v. Rego, Co., 412 So.2d 1143 (La.App. 2d Cir.1982), writs denied, 414 So.2d 774 and 1251.
We find the trial court correctly applied La.C.C. art. 2323 to the jury award because the plaintiff was made to bear eight percent of the damages, and he was compensated for the remaining 42 percent of damages in his "Mary Carter Agreement" with the other defendants. Accordingly, this issue has no merit.
Issue Four
The jury's apportionment of liability caused Wayne Jones to be cast in judgment for an award of $81,000 to Earl Clement III and for a $7000 award to Earl's parents, Mr. and Mrs. Earl Clement, Jr. These figures represent Wayne's liability after the *1011 50 percent reduction for the other defendants' negligence.
Bearing in mind our statutory mandate contained in La.C.C. art. 1934(3) and our jurisprudential guidelines as stated in Reck v. Stevens, 373 So.2d 498 (La.1979), we are accordingly ever mindful that our initial inquiry must always be directed at whether the trial court's award for the particular injuries and their effects upon this particular injured person is a clear abuse of the trier of fact's "much discretion." After a careful review of the medical and lay testimony, we cannot say there was a clear abuse of the much discretion which the trial court possesses of right. Accordingly, we find this issue has no merit.
For the reasons assigned, the judgment of the trial court is affirmed. All costs of this appeal are to be assessed against the appellant.
AFFIRMED.